*This opinion is subject to revision before final publication in the Pacific Reporter*
**2020 UT 51**

IN THE

# SUPREME COURT OF THE STATE OF UTAH

IN THE MATTER OF THE ADOPTION OF K.T.B
A PERSON UNDER EIGHTEEN YEARS OF AGE

V.B.,
*Appellant*,
*v.*
A.S.A. and J.K.A.,
*Appellees*.

No. 20150821
Heard May 12, 2017
Remand Disposition Received March 8, 2018
Filed July 21, 2020

On Direct Appeal

First District, Logan
The Honorable Kevin K. Allen
No. 152100025

Attorneys:

Diane Pitcher, Ryan L. Holdaway, Logan, for appellant

Paul H. Gosnell, Logan, for Appellees

CHIEF JUSTICE DURRANT authored the opinion of the Court, in which JUSTICE HIMONAS and JUSTICE PEARCE joined.

JUSTICE PETERSEN filed a separate opinion concurring in the result.

ASSOCIATE CHIEF JUSTICE LEE filed a dissenting opinion.

CHIEF JUSTICE DURRANT, opinion of the Court:

**Introduction**

¶1    This is an adoption case. In 2010, V.B. (Mother) gave birth to K.T.B. Sometime later, K.T.B. went to live with A.S.A. and J.K.A. (collectively, the Adoptive Parents) and has lived with them ever

since. In early June 2015, the Adoptive Parents filed an adoption petition in the district court and served notice of the proceeding on Mother. The notice informed Mother that she had thirty days to file a motion to intervene in the case or she would forfeit her parental rights in K.T.B. and would be barred from participating further in the adoption proceeding.

¶2    Mother attempted to intervene, but due to a procedural deficiency in the document she filed with the district court, the court struck her filing and excluded her from the adoption proceeding. Mother then filed a rule 60(b) motion seeking relief from the court's order to strike. Around this time, J.N.—Mother's common-law husband—filed his own motion to intervene, asserting, based on his judicially recognized common-law marriage to Mother, that he is K.T.B.'s presumptive father. The district court denied both motions.

¶3    On appeal, Mother challenges the constitutionality of Utah's Adoption Act.[1] Specifically, she argues that the Adoption Act's structure, which permits a district court to terminate parental rights if the parent does not "fully and strictly comply" with the statutory requirements, is unconstitutional as applied to her.[2] We

---

[1] UTAH CODE §§ 78B-6-101 *et seq.* Mother specifically challenges the constitutionality of Utah Code section 78B-6-112. She argues, however, that section 112 "does not operate alone" in the present case because the district court relied on provisions in sections 110 and 120.1 to terminate her parental rights under section 112.

[2] Although at one point in Mother's brief she states that the Adoption Act is unconstitutional "on its face" and "as applied," we note that her claim is more properly viewed as an as-applied challenge. "A statute may be unconstitutional either on its face or as applied to the facts of a given case. A facial challenge is the most difficult because it requires the challenger to 'establish that no set of circumstances exists under which the [statute] would be valid.' An as-applied challenge, on the other hand, succeeds if the challenger shows that the statute was applied to him or her in an unconstitutional manner." *State v. Herrera*, 1999 UT 64, ¶ 4 n.2, 993 P.2d 854, 857 (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987)).

Mother has brought an as-applied challenge. Throughout her briefing, and at oral argument, she repeatedly relies on her status

(Continued)

agree with Mother on substantive due process grounds, so we reverse the district court's order striking Mother's filing.

¶4    Additionally, J.N. argues that the district court erred in denying his motion to intervene because the Adoption Act entitles him to certain rights as K.T.B.'s presumptive father. But because J.N. had not obtained judicial recognition of his common-law marriage at the time the Adoptive Parents filed their adoption petition, the Adoptive Parents had no obligation to serve him with notice. Instead, he was presumed to be on notice that an adoption could occur and was obligated to file a motion to intervene within thirty days of the Adoptive Parents' petition. Because he failed to do so, his motion to intervene was untimely and the district court did not err in denying it.

## Background

¶5    Mother gave birth to K.T.B. in September 2010. His biological father is unknown. In 2013, K.T.B. went to live with the Adoptive Parents. The Adoptive Parents became his legal guardians in June 2014 and one year later they petitioned the district court to terminate Mother's parental rights and allow them to adopt K.T.B. Shortly thereafter, the Adoptive Parents served

---

as a mother with fundamental parental rights as the basis for her claim. In so doing, she repeatedly attempts to distinguish cases where we have upheld strict requirements in the Adoption Act against putative fathers or other individuals lacking fundamental rights from this case. Because these other cases illustrate that there are sets of circumstances where the challenged provisions in this case may be constitutionally applied, they are not facially unconstitutional. Additionally, Mother's argument hinges on facts specific to this case—she argues that her rights were violated "despite the fact [that] she appeared in the action, the court added her as the Respondent, and she filed an Answer asserting her parental rights." Because her due process claim hinges on facts specific to this case, and she does not argue that any provision of the Adoption Act would be unconstitutional under every set of circumstances, her due process claim is properly viewed as an as-applied challenge.

Mother with a notice of the adoption proceedings in accordance with Utah Code section 78B-6-110.[3]

¶6    The notice informed Mother that she had thirty days to intervene or contest the adoption. It explained that her response must be in the form of "a motion to intervene[,] which shall set forth the specific relief sought[] and shall be accompanied by a memorandum specifying the factual and legal grounds upon which the motion is based." It further stated that her failure to respond would "result in [her] waiver of any right to further notice of the proceeding," would cause her to "forfeit any rights in relation to [K.T.B.]," and would "bar[] [her] from thereafter bringing or maintaining any action to assert any interest in [K.T.B.]."

¶7    Within thirty days of receiving the notice of the adoption proceeding, Mother filed an "Answer to Verified Petition for Termination of Parental Rights and for Adoption of Minor Child." Her answer reads like a typical answer in a civil case—it addresses each allegation in the adoption petition separately, denying almost all of them. This included a denial of all of the Adoptive Parents' allegations regarding her parental unfitness and lack of an emotional connection to K.T.B. Importantly, Mother did not include an accompanying memorandum "specifying the factual and legal grounds upon which the motion [was] based," and at no place in the answer did she make legal or factual assertions beyond conclusory admissions or denials of the allegations contained in the adoption petition.

¶8    Additionally, in the answer's prayer for relief, Mother requested "[t]hat petitioners take nothing by way of their Petition," her reasonable attorney fees, and any other relief the court deemed just and appropriate to award.

¶9    After thirty days, the Adoptive Parents asked the district court to strike Mother's answer because she did not comply with the requirements of section 110 of the Adoption Act. Citing section 110's strict compliance requirement, the district court granted the Adoptive Parents' request by striking Mother's answer. The court explained that the "Answer was not accompanied by a memorandum supporting intervention." And it "also did not 'set forth specific relief sought'" because the only relief sought was that

_____

[3] Utah Code section 78B-6-110(2) provides that "[n]otice of an adoption proceeding shall be served on" certain persons, including the mother of the adoptee.

"Petitioners take nothing by way of their Petition." According to the court, this did not qualify as a request to intervene in the adoption, nor did it meet the statutory requirement that the relief be "specific."

¶10 Once the court struck the answer, it concluded that Mother had failed to intervene within the time allotted by section 110. Due to this failure, the court ruled that Mother had "waived any right to further notice in connection with the adoption," had "forfeited all rights in relation to the adoptee," and was "barred [t]hereafter from bringing or maintaining any action to assert any interest in the adoptee." It also found that because she failed to intervene, her consent to the adoption could be implied under section 120.1.[4]

¶11 One month after Mother's exclusion from the adoption proceeding, the court entered findings of fact and conclusions of law, determining that Mother had forfeited her right to consent under sections 110 and 112[5] and, alternatively, that she had implied her consent under section 120.1 by failing to file a timely motion to intervene. Because the court barred her from participating in the adoption proceeding, she could not present evidence to rebut any of the Adoptive Parents' claims.

¶12 Mother challenged the district court's order by filing a motion for relief from the order under rule 60(b) of the Utah Rules of Civil Procedure, but the court denied this motion. The court again relied upon Mother's failure to comply with section 110 as its basis for excluding her from the adoption proceeding.

¶13 Around the same time that Mother filed her rule 60(b) motion, J.N.—Mother's common-law husband—filed a motion to intervene in the adoption. In the motion, J.N. argued that the recent judicial recognition of his common-law marriage to Mother established his role as K.T.B.'s presumptive father. The court

---

[4] Utah Code section 78B-6-120.1(3) provides that "[c]onsent or relinquishment . . . may be implied by . . . receiving notification of a pending adoption proceeding under Subsection 78B-6-110(6) or of a termination proceeding under Section 78B-6-112 and failing to respond as required."

[5] Utah Code section 78B-6-112(5) provides that "[t]he district court may terminate an individual's parental rights in a child if . . . the individual . . . received notice [under section 110] and . . . failed to file a motion for relief . . . within 30 days after the day on which the person receives service."

denied this motion as well. Both Mother and J.N. timely filed notices of appeal.

¶14 On appeal, Mother argues that the district court's application of Utah Code sections 78B-6-110, -112, and -120.1 violated her due process rights, both procedural and substantive, by depriving her of her fundamental right to parent K.T.B.[6] And J.N. argues that the court abused its discretion when it denied his motion to intervene because the Adoption Act entitles him to notice of, and to intervene in, the adoption as K.T.B.'s presumptive father. After oral argument we temporarily remanded this case to the district court for a determination of the enforceability of a post-adoption settlement agreement entered into by the parties. The district court determined that the agreement was based on an illusory promise and was therefore unenforceable. On return from remand we must now resolve the case on the merits. We have jurisdiction pursuant to Utah Code section 78A-4-103(2)(h).

**Standards of Review**

¶15 Mother argues that the district court violated her right to due process because it applied certain provisions in Utah Code sections 78B-6-110, -112, and -120.1 to terminate her parental rights over her objection and without a finding of unfitness. "Constitutional issues, including questions regarding due process, are questions of law, and we review the lower court's conclusions for correctness."[7]

¶16 Additionally, J.N. argues that the court should have allowed him to intervene in the adoption proceedings after his common-law marriage to Mother was legally recognized. "A determination under rule 24(a)(1)" of the Utah Rules of Civil Procedure, "which permits intervention 'when a statute confers an unconditional right to intervene,' implicates two questions."[8] The

---

[6] Mother bases her claim on the guarantees of the Due Process Clauses of the Fifth and Fourteenth Amendments to the United States Constitution and of article I, section 7 of the Utah Constitution. All three provisions provide that no person shall be deprived "of life, liberty, or property, without due process of law."

[7] *Summerhaze Co., L.C. v. Fed. Deposit Ins. Corp.*, 2014 UT 28, ¶ 8, 332 P.3d 908 (citation omitted) (internal quotation marks omitted).

[8] *Swallow v. Jessop (In re United Effort Plan Trust)*, 2013 UT 5, ¶ 21, 296 P.3d 742 (citations omitted).

first is "whether a particular statute affords a particular class of persons an unconditional intervention right."[9] This presents "a pure question of law because it involves abstract statutory construction. A district court would not be entitled to any deference to the extent it misinterpreted an intervention statute in the abstract."[10] And the second question is "whether a particular individual actually fits within the class of persons entitled to intervene under a statute."[11] This "presents a classic mixed question because it 'involv[es] application of a legal standard to a set of facts unique to a particular case.'"[12]

**Analysis**

¶17 Mother argues that the "statutory scheme" of Utah's Adoption Act[13] is "constitutionally infirm" because it authorized the district court to violate her constitutional rights.[14] Specifically, she argues that three sections of the Adoption Act—sections 110, 112, and 120.1 "operated together [to authorize the district court] to terminate a mother's rights, over her objections, and without a finding of unfitness or best interest of the minor child." No one

---

[9] *Id.*

[10] *Id.*

[11] *Id.*

[12] *Id.* (alteration in original) (citation omitted).

[13] UTAH CODE §§ 78B-6-101 *et seq.*

[14] Mother also argues that the district court erred in striking her answer, barring her from the adoption proceedings, and entering her implied consent to the adoption under Utah Code section 78B-6-120.1. "Motions to strike pleadings or parts thereof are addressed to the judgment and discretion of the trial court. A ruling thereon, except under circumstances which amount to a clear abuse of discretion, will not be disturbed on appeal." *Francis v. State*, 2013 UT 65, ¶ 19, 321 P.3d 1089 (internal quotation marks omitted). Because our determination regarding her due process claim makes it unnecessary to decide this claim, we decline to address it. Additionally, the Adoptive Parents argue that Mother failed to preserve her constitutional challenge to the Adoption Act's scheme. But the record reveals that Mother challenged the district court's decision on due process grounds on two separate occasions: first in her opposition to the motion to strike and again in her rule 60(b) motion. And so we find that she preserved this issue for appeal.

disputes that provisions within the Adoption Act authorized the district court to terminate Mother's parental rights. To determine whether this termination amounts to either a procedural or substantive due process violation, we first consider the Adoption Act's statutory framework. We then analyze whether the district court violated Mother's procedural or substantive due process rights when it terminated her parental rights pursuant to provisions within the Adoption Act. We ultimately conclude that the strict compliance requirement in section 110 of the Adoption Act is unconstitutional as applied to Mother.

¶18 Additionally, J.N. argues that the district court erred when it denied his motion to intervene because he was entitled to do so as K.T.B.'s presumptive father.[15] Although he filed his motion almost four months after the Adoptive Parents filed their adoption petition, J.N. argues that it was nevertheless timely because he never received the notice to which he was entitled as K.T.B.'s presumptive father. But because J.N.'s marriage had not been legally recognized at the time the Adoptive Parents filed their petition, they were not obligated to serve J.N. with notice. Instead, J.N. was presumed to be on notice and had an obligation to file a motion to intervene within thirty days of the date the Adoptive Parents filed their petition.

## I. Framework of the Adoption Act

¶19 Under the Adoption Act, when individuals file a petition for adoption, they must serve notice of the adoption proceeding upon a number of specified people, including the adoptee's biological mother.[16] "A person who has been served with notice of an adoption proceeding and who wishes to contest the adoption [must] file a motion to intervene in the adoption proceeding . . . within 30 days after the day on which the person was served with

---

[15] We note that J.N., unlike Mother, has not raised any constitutional challenges to the Adoption Act.

[16] UTAH CODE § 78B-6-110(2) (2017) ("Notice of an adoption proceeding shall be served on . . . any person or agency whose consent or relinquishment is required under Section 78B-6-120 or 78B-6-121, unless that right has been terminated by: (i) waiver; (ii) relinquishment; (iii) actual consent, as described in Subsection (12); or (iv) judicial action."); *id.* § 78B-6-120(c) (identifying "mother of the adoptee" as a person from whom consent or relinquishment is required before an adoption may take place).

notice."[17] This motion must "set[] forth specific relief sought" and be "accompanied by a memorandum specifying the factual and legal grounds upon which the motion is based."[18]

¶20  If the biological mother fails to "fully and strictly comply with all of the requirements," she "(i) waives any right to further notice in connection with the adoption; (ii) forfeits all rights in relation to the adoptee; and (iii) is barred from thereafter bringing or maintaining any action to assert any interest in the adoptee."[19] Under section 112, a district court may then terminate the mother's parental rights in her child.[20] And under section 120.1, the mother is deemed to have consented to the adoption or otherwise relinquished her rights in her child.[21]

¶21 Together, these three sections of the Adoption Act permitted the district court to terminate Mother's parental rights over her objection and without a determination that she was an unfit parent. For this reason she argues that the Adoption Act is unconstitutional as applied to her.

## II. Mother's Procedural Due Process Rights Were Not Violated

¶22  First, Mother argues that the Adoption Act authorized the district court to violate her procedural due process rights.[22] "At its core, the due process guarantee is twofold—reasonable notice and an opportunity to be heard."[23] Because Mother fails to show that the Adoption Act authorized the district court to violate either of these guarantees, her procedural due process claim fails.

¶23 Mother's right to reasonable notice was not infringed upon. "Before a right of property or other important interest is

---

[17] *Id.* § 78B-6-110(6)(a).

[18] *Id.*

[19] *Id.* § 78B-6-110(6)(b).

[20] *Id.* § 78B-6-112(5)(c).

[21] *Id.* § 78B-6-120.1(3)(d).

[22] Although Mother categorizes her challenge of the Adoption Act as both a procedural and substantive due process challenge, she does not direct much, if any, of her argument toward the procedural due process standard.

[23] *In re Adoption of B.Y.*, 2015 UT 67, ¶ 16, 356 P.3d 1215 (citing *United States v. James Daniel Good Real Prop.*, 510 U.S. 43, 48 (1993)).

foreclosed as a result of state action, reasonable notice must be afforded."[24] On appeal, Mother admits that she received notice of the adoption proceeding and of her obligation to participate in it. Accordingly, her right to reasonable notice has not been violated.

¶24   What is less clear, however, is whether Mother received an adequate opportunity to be heard. As we have previously explained, "[m]ere notice is an empty gesture if it is not accompanied by a meaningful chance to make your case."[25] For this reason, "the Due Process Clause also guarantees . . . an opportunity to be heard at a meaningful time and in a meaningful manner."[26] In this case, the district court relied upon the strict compliance requirement in section 110 of the Adoption Act to deprive Mother of an opportunity to contest the termination of her parental rights to K.T.B., as well as K.T.B.'s subsequent adoption.

¶25   But the promise of an opportunity to be heard may be limited by reasonable procedural prerequisites.[27] Thus if a statute of limitations, or some other procedural requirement, bars an individual from participating in a legal proceeding affecting his or her rights, a procedural due process violation has not occurred unless the "procedural bar can be shown to foreclose[] . . . meaningful access to the justice system."[28] "In past cases, we have found this standard to be met by a showing of *impossibility*."[29]

¶26   The impossibility inquiry contemplates whether "the right to notice and an opportunity to be heard were 'completely within [the affected person's] control.'"[30] In other words, if the plaintiff

---

[24] *Id.* ¶ 18 (citing *Mathews v. Eldridge*, 424 U.S. 319, 348 (1976)).

[25] *Id.* ¶ 23.

[26] *Id.* (internal quotation marks omitted) (quoting *Gray v. Netherland*, 518 U.S. 152, 182 (1996)).

[27] *See Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 437 (1982) ("The State may erect reasonable procedural requirements . . . [such as] statutes of limitations . . . . And the State certainly accords *due* process when it terminates a claim for failure to comply with a reasonable procedural . . . rule.").

[28] *In re Adoption of B.Y.*, 2015 UT 67, ¶ 27 (alteration in original) (citation omitted) (internal quotation marks omitted).

[29] *Id.* ¶ 28.

[30] *Id.* ¶ 32 (citation omitted).

could have complied with the procedural requirement under the circumstances, compliance is possible, and the plaintiff's access to the justice system has not been foreclosed. Thus where the statute "afford[s] a reasonable opportunity to comply with the statute," the statute's procedural requirements do not offend procedural due process.[31]

¶27  Two of our previous cases illustrate a proper impossibility determination. First, in *Ellis v. Social Services Department of the Church of Jesus Christ of Latter-Day Saints*,[32] we upheld a putative father's procedural due process claim challenging the requirements of the Adoption Act because his compliance with the law was shown to have been rendered "impossible" through no fault of his own.[33] In that case, the adoptee's biological father and mother were engaged to be married and both resided in California, but two weeks before the wedding the mother broke off the engagement.[34] Then, just a few days before giving birth, the mother traveled to Utah from California without the father's knowledge, where she placed the newborn for adoption (after representing to those involved that the father was unknown).[35] After considering these facts we noted that due process requires a "reasonable opportunity to comply" with the statutory prerequisites to the establishment of a parental right.[36] And because the father could not have complied with the Adoption Act's procedural requirements under the facts alleged, we concluded that the requirements had violated the father's due process rights.[37]

¶28  In contrast to our decision in *Ellis* is our decision in *In re Adoption of J.S.*[38] In that case, the district court barred a putative father from intervening in an adoption because he failed to file a required paternity affidavit within the time the Adoption Act

---

[31] *Id.* ¶ 31 (citation omitted).

[32] 615 P.2d 1250 (Utah 1980).

[33] *Id.* at 1256.

[34] *Id.* at 1252.

[35] *Id.*

[36] *Id.* at 1256.

[37] *Id.*

[38] 2014 UT 51, 358 P.3d 1009.

allotted.[39] The father appealed the denial of his motion to intervene. As part of his procedural due process argument on appeal, the father blamed the deficiency in this filing on "his attorney's failure to advise him that such an affidavit was required."[40] Because the father did not specify whether he was bringing a procedural or substantive due process challenge to the Adoption Act's filing requirements, we were forced to speculate on the nature of his claim.[41] We determined that his claim could not be characterized as a procedural due process challenge, because he claimed his procedural deficiency was due to "his counsel allegedly g[iving] him bad legal advice," not due to an overly difficult procedural requirement.[42] So our decision in *In re Adoption of J.S.* suggests that the failure to comply with a procedural requirement due to a mistake by an attorney cannot sustain a procedural due process claim under the impossibility inquiry.[43]

¶29 Like the procedural deficiency in *In re Adoption of J.S.*, Mother's failure to comply with the Adoption Act's procedural requirements can be attributed to a mistake by legal counsel. Mother received notice under section 110 informing her of both what was required to intervene in the proceedings and what would happen if she did not intervene. Rather than file a motion to intervene within thirty days, she filed an answer to the Adoptive Parents' petition, which the district court found did not satisfy section 110's strict compliance requirement. Mother does not suggest that compliance was impossible or too difficult.[44] In fact, compliance clearly was neither impossible nor too difficult because Mother was able to file a compliant motion to intervene immediately after the Adoptive Parents filed their motion to strike. So the only plausible explanation for the deficiencies in Mother's original attempt to intervene is that her legal counsel misread or

---

[39] *Id.* ¶ 1.

[40] *Id.* ¶ 11.

[41] *Id.* ¶ 19.

[42] *Id.* ¶ 23.

[43] *Id.* ¶¶ 23–24.

[44] Instead, Mother has argued that strict compliance and intervention is unnecessary for a biological mother. This challenge is more properly categorized as a substantive due process challenge.

misunderstood section 110's legal requirements.[45] But as *In re Adoption of J.S.* illustrates, when the failure to comply with a "simple and straightforward" procedural requirement is due to legal counsel's mistake, the procedural requirement has not foreclosed meaningful access to the justice system.[46] Accordingly, Mother fails to show that the Adoption Act deprived her of her constitutional right to an opportunity to be heard.

¶30  Because Mother's constitutional rights to reasonable notice and an opportunity to be heard were not violated, her procedural due process challenge of the Adoption Act fails.

### III. Mother's Substantive Due Process Rights Were Violated Because Section 110's Strict Compliance Requirement is Not Narrowly Tailored

¶31  Mother also challenges the Adoption Act's framework under the substantive component of the Due Process Clause. Such a claim is distinct from the procedural due process challenge analyzed above. In contrast to a procedural due process attack, a substantive challenge "involve[s] a broad-side attack on the fairness of the procedural bar or limitation, on the ground that the right foreclosed is so fundamental or important that it is protected from extinguishment."[47] In other words, a substantive due process challenge alleges that a procedural requirement is unfair because it improperly infringes an important right rather than because it operates to unfairly foreclose notice or a meaningful opportunity to be heard. So if a statute allows the state to improperly extinguish or foreclose a protected right, even if it does so through straightforward procedural requirements, it is unconstitutional under the substantive component of the Due Process Clause.

*A. The district court applied provisions of the Adoption Act to extinguish Mother's fundamental right to parent K.T.B.*

¶32 Whether a statute improperly allows the state to extinguish or foreclose a protected right depends on the nature of the right and its attendant standard of review. If the right infringed or foreclosed is a right we have deemed "fundamental," we review

---

[45] Mother was represented by counsel when she filed her answer.

[46] 2014 UT 51, ¶ 23.

[47] *In re Adoption of B.Y.*, 2015 UT 67, ¶ 41, 356 P.3d 1215 (alteration in original) (internal quotation marks omitted).

the statute under our strict scrutiny standard.[48] But if it is not fundamental, we review it under "the deferential, fallback standard of rationality or arbitrariness."[49]

¶33 The importance of correctly characterizing the nature of the right at issue was illustrated in our recent decision in *In re B.Y.*[50] In that case, we considered an unmarried biological father's challenge to a "strict compliance provision of the Adoption Act."[51] We explained that this procedural provision of the Adoption Act had been challenged on procedural and substantive due process grounds.[52] We then proceeded to analyze the procedural requirement under both frameworks.

¶34 First, we analyzed the claim on procedural due process grounds, determining that the claim failed because "it was not impossible" for the unmarried father to comply with the strict compliance provision at issue.[53] This was the correct analysis for a procedural due process claim, and it is the same analysis we have applied to Mother's procedural due process claim in this case.

¶35 After deciding the father's procedural due process claim, we turned to his substantive one.[54] And we appropriately commenced our substantive due process analysis by identifying the nature of the infringed right. We determined that the right infringed in that case was "merely provisional" because the plaintiff was an unmarried biological father who had failed to perfect his parental rights by following the procedures established

---

[48] *Jones v. Jones*, 2015 UT 84, ¶ 26, 359 P.3d 603 ("When the court has recognized a due process right it deems 'fundamental,' it consistently has applied a standard of strict scrutiny to the protection of such a right.").

[49] *In re Adoption of J.S.*, 2014 UT 51, ¶ 56, 358 P.3d 1009 (plurality opinion).

[50] 2015 UT 67.

[51] *Id.* ¶ 41.

[52] *Id.*

[53] *Id.* ¶¶ 16, 37, 40 (internal quotation marks omitted).

[54] *Id.* ¶ 41 (noting that the father had also "challenge[d] the application of the strict compliance provision . . . under the substantive component of the Due Process Clause." (emphasis omitted)).

in law.[55] Because the unmarried biological father's right did not rise to the level of a fundamental right, we considered the father's claim under the more deferential rational-basis prong of the substantive due process analysis.[56] Under this standard, we rejected the father's claim because the procedural requirement that barred the father from participating in the adoption proceeding—a strict compliance provision—was "far from arbitrary."[57] Thus our decision in *In re B.Y.* hinged on the provisional nature of the unmarried father's right and on the standard of review we applied to the statutory provision in question.

¶36 In contrast to the right at issue in *In re B.Y.*, the right at issue in this case is fundamental. Although "[s]ome variation exists" among the parental rights of unmarried fathers depending on the steps they have taken to perfect their parental rights,[58] "no similar variation exists" among the parental rights of unmarried mothers.[59]

¶37 Unmarried mothers "acquire parental rights—*and the accompanying right to object to an adoption*—as a result of the objective

---

[55] *Id.* ¶ 43. In *In re B.Y.*, we explained that the right of an unmarried father is "merely provisional" until the father complies with the requirements established for the perfecting of that right. *Id.* This ruling is consistent with the United States Supreme Court's decision in *Lehr v. Robertson*, where the Court explained that an unmarried father does not have a recognized parental right until he takes some affirmative action to "grasp" the opportunity to develop a relationship with his child. 463 U.S. 248, 262 (1983). Thus the right at issue in *In re B.Y.* was not a fundamental parental right, but a provisional right to an "opportunity" to develop a parental right. *See id.* at 262–63 ("We are concerned only with whether New York has adequately protected [the unmarried father's] opportunity to form such a relationship.").

[56] *In re B.Y.*, 2015 UT 67, ¶ 43 (determining whether "the prerequisites established by the state [were] arbitrary" (emphasis omitted)).

[57] *Id.* ¶ 46.

[58] *In re J.P.*, 648 P.2d 1365, 1374 (Utah 1982); *see also In re Adoption of J.S.*, 2014 UT 51, ¶ 2 (distinguishing between the requirements imposed on unmarried fathers and unmarried mothers).

[59] *In re J.P.*, 648 P.2d at 1374–75.

manifestation of the commitment to the child that is demonstrated by their decision to carry a child to term."[60] So even though an unmarried father may be required to comply with certain procedural requirements before his parental rights become fundamental, an unmarried mother's parental rights are "vested"[61] and "inherent"[62] without her having to comply with the same procedural requirements.[63] In fact, this court has held that the right of a mother "not to be deprived of parental rights without a showing of unfitness, abandonment, or substantial neglect is *so fundamental* to our society and so basic to our constitutional order . . . that it ranks among those rights referred to in Article I, [section] 25 of the Utah Constitution and the Ninth Amendment of the United States Constitution as being *retained* by the people."[64] In other words, mothers retain a fundamental right in their children regardless of a failure to comply with any state-prescribed procedure.[65] And this right remains in effect absent "a showing of unfitness, abandonment, or substantial neglect."[66] So if a statute

---

[60] *In re Adoption of J.S.*, 2014 UT 51, ¶ 2 (emphasis added).

[61] *Wells v. Children's Aid Soc'y of Utah*, 681 P.2d 199, 206 (Utah 1984) (citation omitted).

[62] *In re J.P.*, 648 P.2d at 1373.

[63] S*ee In re Adoption of J.S.*, 2014 UT 51, ¶ 2 (explaining that an "unwed father's legal obligation to file the paternity affidavit [was] a rough counterpart to the mother's commitment," which is "demonstrated by [the mother's] decision to carry a child to term").

[64] *In re J.P.*, 648 P.2d at 1375 (emphases added); *see also id.* at 1372 (explaining that a mother "has a fundamental right, protected by the Constitution, to *sustain* [her] relationship with [her] child" (emphasis added) (citation omitted) (internal quotation marks omitted)).

[65] In fact, the Supreme Court has stated that, "[i]f anything, persons faced with forced dissolution of their parental rights have a more critical need for procedural protections" than do others. *Santosky v. Kramer*, 455 U.S. 745, 753 (1982). For this reason, states "must provide . . . parents with fundamentally fair procedures" when moving to destroy parental bonds. *Id.* at 753–54.

[66] *Wells*, 681 P.2d at 204; *see also In re J.P.*, 648 P.2d at 1372 ("[T]he correlative of parental rights is parental duties. When parents fail to, or are incapable of, performing their parental obligations, the
(Continued)

authorizes a court to terminate a mother's parental rights without her consent or without proof of unfitness, abandonment, or neglect, a fundamental right has been infringed upon, and we determine the constitutionality of the infringing statute by reviewing it under the strict scrutiny standard.[67]

¶38 As applied in this case, the Adoption Act authorized the district court to terminate Mother's parental rights without her consent and without proof of parental unfitness, abandonment, or neglect. Specifically, section 110 authorized the court to rule that Mother had "forfeit[ed] all rights in relation to the adoptee" because she failed "to fully and strictly comply with all of the requirements" listed in that section. And because she failed to strictly comply with the requirements of section 110, section 112 allowed the court to terminate her parental rights, and section 120.1 allowed the court to rule that she had lost her right to consent or object to the adoption.[68]

---

child's welfare must prevail over the right of the parent." We have noted, of course, that mothers and fathers may "*choose* to waive" their parental rights. *In re Adoption of J.S.*, 2014 UT 51, ¶ 2 (emphasis added).

[67] *In re Adoption of J.S.*, 2014 UT 51, ¶ 42. By recognizing that statutorily imposed consequences for a failure to comply with procedural requirements infringe on a mother's fundamental right, we are not suggesting that mothers may never be subject to procedural requirements. Instead, we are merely recognizing that where a procedural requirement—and the statutorily imposed consequences for failing to comply with that requirement— infringe on a fundamental right, that requirement is constitutional only so long as it is narrowly tailored to further a compelling state interest.

[68] The dissent argues that the Adoption Act does not authorize the termination of parental rights "without requiring 'proof of unfitness, abandonment, or neglect'" because, had Mother strictly complied with the procedural requirements of the Act, she could have had an opportunity to defend her parental rights. *See infra* ¶ 154 n.213 (Lee, A.C.J., dissenting). Not only does this argument ignore the "as-applied" nature of Mother's substantive due process claim, but it also ignores our case law, which clearly recognizes a mother's right to maintain her parental rights unless she
(Continued)

¶39 The Adoptive Parents argue, however, that Mother's parental rights were not terminated by her failure to strictly comply with the Adoption Act's procedural requirements. Instead, they assert that her parental rights were properly terminated after the district court considered relevant evidence at the uncontested adoption hearing held the following month.[69] This argument fails because Mother had already been stripped of "all rights in relation to the adoptee"[70]—including the right to contest, or consent to, the adoption—by the time the court heard evidence relevant to a proper termination of parental rights.[71] In other words, because the Adoption Act authorized the district court to bar Mother from participating in the adoption proceeding, Mother's right to defend her parental rights was extinguished.[72] So even if section 110's strict

---

voluntarily relinquishes them or a court finds that she forfeited them by being an unfit parent or by abandoning or neglecting the child. So where this right is terminated for some other reason—such as in consequence of a mother's procedural default—the termination of the mother's parental rights must be reviewed under our strict scrutiny standard. And we note that, contrary to the dissent's suggestion, this rule does not exempt mothers from constitutionally valid procedural requirements.

[69] This assertion is only partially correct. Although the district court noted that the Adoptive Parents had provided sufficient evidence of abuse, unfitness, and neglect in its findings of fact and conclusions of law, it also based its decision to terminate Mother's parental rights on the fact that Mother's right to consent had been forfeited under sections 110 and 112, and that under section 120.1 her consent could be implied.

[70] UTAH CODE § 78B-6-110(6)(b)(ii).

[71] *In re Adoption of J.S.*, 2014 UT 51, ¶ 2 (explaining that a mother's parental rights include the "right to object to an adoption"); *see also In re J.P.*, 648 P.2d at 1372 (explaining that a mother "has a fundamental right, protected by the Constitution, to *sustain* [her] relationship with [her] child" (emphasis added) (citation omitted) (internal quotation marks omitted)).

[72] *See In re K.J.*, 2013 UT App 237, ¶ 26, 327 P.3d 1203 (explaining that in a typical proceeding to terminate parental rights, although the "petitioner bears the ultimate burden of proving the grounds for termination by clear and convincing evidence, once evidence is
(Continued)

compliance requirement did not immediately allow the court to extinguish the full spectrum of Mother's parental rights, it nevertheless infringed in part on Mother's parental rights by requiring the court to exclude her from the adoption proceeding and mandating the forfeiture of "all [her] rights in relation" to K.T.B.[73]

*B. As applied to this case, section 110's strict compliance provision fails strict scrutiny review*

¶40 Because the Adoption Act authorized the district court to terminate a fundamental right in this case, we must analyze it under the strict scrutiny standard.[74] Under the strict scrutiny standard, "a fundamental right is protected except in the limited circumstance in which an infringement of it is shown to be 'narrowly tailored' to protect a 'compelling governmental interest.'"[75] Section 110's strict compliance requirement fails this test.[76] Even though the Adoption Act's procedural requirements serve a number of compelling governmental interests, in this case the strict compliance requirement in section 110 was not necessary

---

presented that would justify termination, the burden shifts to the parent to persuade the court that the [petitioner] had not established [the ground for termination] by clear and convincing evidence." (alterations in original) (citations omitted) (internal quotation marks omitted)).

[73] *In re J.P.*, 648 P.2d at 1372–77 (recognizing a parent's fundamental right to "maintain parental ties to his or her child," and "in the care, custody, and management of [his or her] child," as well as the right of a mother "not to be deprived of parental rights without a showing of unfitness, abandonment, or substantial neglect").

[74] *See Jones*, 2015 UT 84, ¶ 26.

[75] *Id.* ¶ 27 (quoting *Washington v. Glucksberg*, 521 U.S. 702, 721 (1997)).

[76] Although Mother has challenged three sections of the Adoption Act—sections 110, 112, and 120.1—as they work together, it is the strict compliance provision of section 110 that prompted the district court's termination of Mother's parental rights. Accordingly, we focus on this requirement in our strict scrutiny analysis.

to protect those interests and therefore it is unconstitutional as applied to Mother.

¶41 Although we have previously recognized that the "strict laws" in the Adoption Act further the state's interest in promoting prompt and stable adoptions,[77] we have not yet considered the constitutionality of section 110's strict compliance requirement under a strict scrutiny analysis.[78] So even though we have previously concluded that section 110's requirements are not merely arbitrary,[79] we have not yet determined whether those requirements were necessary to achieve the state's compelling adoption-related interests under the circumstances presented in this case. We do so now.

¶42 The State of Utah has a number of "compelling interest[s] in the adoption process."[80] First, "the state has a compelling interest in providing stable and permanent homes for adoptive children in a prompt manner."[81] Second, it has an interest "in preventing the disruption of adoptive placements."[82] And third, it has an interest "in holding parents accountable for meeting the needs of children."[83] These interests satisfy the strict scrutiny standard's "compelling interest" prong.[84] Accordingly, we review section

---

[77] *In re Adoption of B.B.D.*, 1999 UT 70, ¶ 14, 984 P.2d 967.

[78] *See*, *e.g.*, *In re Adoption of B.Y.*, 2015 UT 67, ¶¶ 42–46 (declining to consider a putative father's substantive due process claim under a strict scrutiny standard because the father had not yet perfected his parental rights and holding that until a putative father perfects his parental rights under the Adoption Act, his rights are "merely provisional" rather than fundamental).

[79] *See id.* ¶¶ 41–46 (holding that "the strict compliance provision of the Adoption Act" was not arbitrary in the context of a putative father's due process challenge).

[80] *In re Adoption of B.B.D.*, 1999 UT 70, ¶ 14 (internal quotation marks omitted).

[81] UTAH CODE § 78B-6-102(5)(a).

[82] *Id.*

[83] *Id.*

[84] *See*, *e.g.*, *Thurnwald v. A.E.*, 2007 UT 38, ¶¶ 30, 34, 163 P.3d 623 (concluding that the state had a compelling interest in "speedily

(Continued)

110's strict compliance requirement to determine if it is narrowly tailored to facilitate these interests.

¶43 Under strict scrutiny's "narrowly tailored" prong, we must determine whether the "legitimate state purpose [could] be . . . more narrowly achieved."[85] In other words, we consider whether the challenged provisions were "necessary" to achieve the state's purpose in facilitating a prompt and stable adoption of K.T.B., in preventing a disruption of that adoption, or in holding parents accountable for K.T.B.'s needs.[86]

¶44 Section 110 requires a person to "file a motion to intervene in the adoption proceeding."[87] If the person fails to intervene within thirty days, that person is excluded from the adoption proceeding going forward.[88] This timely intervention requirement serves the state's interest in providing prompt adoptions and in preventing their disruption by a parent who chose not to intervene but later reconsiders this decision.

¶45 As part of section 110's intervention requirement, the motion to intervene must "set[] forth specific relief sought" and be

---

identifying those persons who will assume a parental role over newborn illegitimate children," "in promoting early and uninterrupted bonding between child and parents[,] and in facilitating final and irrevocable adoptions." (citations omitted) (internal quotation marks omitted).

[85] *In re Boyer*, 636 P.2d 1085, 1090 (Utah 1981). The dissent criticizes us for applying this standard. *See infra* ¶ 165 (Lee, A.C.J., dissenting). But we are merely applying the standard that has been well-established by our case law. In contrast to this established approach, the dissent suggests that a loss of an indisputably fundamental right does not trigger strict scrutiny review where that loss stemmed from a procedural default. *See infra* ¶ 217 (Lee, A.C.J., dissenting) (suggesting that "procedures" may never be subject to "substantive due process scrutiny"). Because such an approach would be inconsistent with controlling precedent, we reject it. *See infra* ¶¶ 51–101.

[86] *Wells v. Children's Aid Soc'y of Utah*, 681 P.2d at 207 (considering whether any "infringement of the [plaintiff's] rights not essential to the statute's purpose ha[d] been identified").

[87] UTAH CODE § 78B-6-110(6)(a).

[88] *Id.* § 78B-6-110(6)(b).

21

"accompanied by a memorandum specifying the factual and legal grounds upon which the motion is based."[89] These sub-requirements serve section 110's overarching purpose. They do so by (1) notifying the court and the petitioners of who will be contesting the adoption and (2) informing the court of the legal basis on which that person is entitled to intervene, thereby allowing the court to quickly weed out improper interveners. Mother's attempt to intervene satisfied section 110's overarching purpose as well as the underlying purposes of section 110's filing requirements.

¶46 Mother filed an "Answer to Verified Petition for Termination of Parental Rights and for Adoption of Minor Child" within thirty days of receiving the notice of the adoption proceeding. And although her answer was not accompanied by a memorandum "specifying the factual and legal grounds upon which the [answer] was based," she did admit in her answer that she was K.T.B.'s mother, as well as deny all of the factual allegations upon which the Adoptive Parents based their request to terminate her parental rights. Moreover, in the answer's prayer for relief, Mother requested that the Adoptive Parents "take nothing by way of their Petition."

¶47 This answer fulfilled the purposes of section 110's motion to intervene requirement. First, we note that "it is the substance, not the labeling, of a motion that is dispositive in determining the character of the motion."[90] Based on the substance of Mother's answer, the court and the Adoptive Parents knew or should have known that Mother wanted to participate in the proceeding in order to oppose the adoption. They also knew or should have known that Mother intended to participate by providing evidence to defend against the factual allegations they advanced in support of their request to terminate Mother's parental rights. And because the answer was filed within thirty days, it did not hinder the state's interest in facilitating a prompt adoption.

¶48 Second, the court's interest in barring improper parties from the proceedings was not hindered by the procedural deficiencies in Mother's answer. Mother is indisputably K.T.B.'s

---

[89] *Id.* § 78B-6-110(6)(a)(ii), (iii).

[90] *Bair v. Axiom Design, L.L.C.*, 2001 UT 20, ¶ 9, 20 P.3d 388, *abrogated on other grounds by Gillett v. Price*, 2006 UT 24, ¶ 2, 135 P.3d 861, *as recognized in A.S. v. R.S.*, 2017 UT 77, ¶ 21, 416 P.3d 465.

biological mother. And at oral argument before us, the Adoptive Parents conceded that timely motions to intervene brought by a biological mother are granted as a matter of course. Thus, even though Mother's answer did not trigger scheduled briefing and oral argument as a motion to intervene would have done, the answer nevertheless fulfilled section 110's purposes by alerting the court—and the Adoptive Parents—that K.T.B.'s biological mother sought to participate in the proceedings. Stated differently, in light of Mother's unquestioned status as K.T.B.'s biological mother, the contents of the Adoptive Parents and Mother's pleadings provided the district court with all of the information it needed to rule on the issue of Mother's intervention. So in this case, section 110's purposes were fulfilled by Mother's attempt to intervene through her answer.

¶49 But section 110 also states that its requirements must be "fully and strictly" complied with.[91] Despite the fact that Mother's answer did not hinder the state's compelling interests in promoting prompt and stable adoptions, the district court barred her from the adoption proceeding because she failed to strictly comply with section 110's filing requirements. And this inevitably led the court to terminate all of Mother's parental rights pursuant to section 112.

¶50 Because Mother's timely filed answer—though not strictly compliant with section 110's procedural sub-requirements— achieved everything section 110 is designed to achieve, we cannot say that the strict compliance requirement was necessary to achieve the state's compelling adoption-related interests in this case. For this reason we hold that section 110's strict compliance provision is unconstitutional as applied to Mother.[92] Accordingly, we reverse

---

[91] UTAH CODE § 78B-6-110(6)(b).

[92] To be clear, in holding that the strict compliance component of section 110 fails the strict scrutiny test, as applied to Mother in this case, we are not suggesting, as Mother argues in her brief, that the entire motion-to-intervene provision is "meaningless" as applied to biological mothers. In fact, by holding that the timing and substantive requirements of the provision are necessary to further the state's purposes, *see supra* ¶¶ 45–46, we have held the opposite. So we are not lightly excusing the procedural requirements of the Adoption Act in this case. Rather, we have narrowed the scope of our opinion to the strict compliance

(Continued)

the district court's decision to strike Mother's answer and remand to the district court for further proceedings, in which Mother may participate, on the Adoptive Parents' adoption petition.

*C. The arguments raised by the dissent are unpersuasive*

¶51 The dissent disagrees with our resolution of Mother's substantive due process claim. At its heart, the dissent's disagreement stems from a different view of the right at issue. We contend that the right at issue is Mother's fundamental right to parent—a right firmly rooted in our history and case law. Because we view the right at issue to be fundamental, any governmental

———————————————

provision in Utah Code section 78B-6-110(6)(b) and to the facts of this case.

We also note that the dissent criticizes our decision on the ground that "strict procedural compliance" is "at a premium" in the "adoption arena." *See infra* ¶ 207 (Lee, A.C.J., dissenting). But in so doing, the dissent fails to engage with the specific and narrow reasoning in our decision. Instead, it argues only that "statutory procedures for natural parents to participate in and assert their rights" are a core element in the state's effort to facilitate adoptions. *See infra* ¶ 207 (Lee, A.C.J., dissenting). We take no issue with this general statement. But the dissent has failed to explain how the strict compliance requirement would have aided the State's effort to facilitate adoptions in this case. As we have discussed, in this case, Mother's timely attempt to intervene provided the court and the Adoptive Parents all of the information that a strictly compliant motion to intervene would have. For this reason, our decision in no way hinders the interests advanced by the procedural requirements of the Adoption Act.

The dissent also suggests that, by subjecting the procedural requirements of the Adoption Act to a substantive due process review, we are foreclosing the state's ability to impose procedural time bars in the adoption setting. *See infra* ¶ 213 (Lee, A.C.J., dissenting). But our case law makes clear that procedural requirements have long been subject to substantive due process. And the dissent's suggestion that subjecting procedural requirements to the demands of substantive due process will upend all procedural requirements misses the mark. Indeed, in this very case, we have upheld other procedural requirements in section 110—including section 110's thirty-day filing requirement—as being narrowly tailored to further the state's interest in prompt adoptions.

infringement of that right is subject to strict scrutiny review.[93] And in applying our well-established strict scrutiny test, we have determined that the state violated Mother's fundamental parental rights when it terminated those rights despite Mother's timely, and substantially compliant, attempt to intervene. In other words, because the strict compliance requirement did not further the State's compelling, adoption-related interests in this case, we hold that the strict compliance requirement is unconstitutional as applied in this case.

¶52 The dissent, in contrast, argues that the rights at issue in this case are not Mother's parental rights—the rights that were terminated by the State. Instead, it argues that the right at issue is Mother's *right to retain her right* to parent despite a failure to comply with procedural requirements. In other words, rather than asking whether Mother, as K.T.B.'s biological mother, has a constitutionally protected interest in engaging in any of the conduct inherent in the parent-child relationship, the dissent asks whether Mother has a constitutionally protected interest in being free from a particular form of governmental interference. But we reject this characterization of the right at issue because it is inconsistent with our case law, and it would lead us to entirely overlook the substantial parental interests at the heart of this case.

¶53 But before we discuss the specific ways in which the dissent's approach is inconsistent with our case law, we also note that, as a practical matter, the dissent's approach would strip Mother's parental rights of their fundamental status. The dissent concedes that Mother had fundamental parental rights. And it cannot dispute that those fundamental rights were terminated by the State. Despite this, the dissent argues that the relevant right at issue in this case is not one of the fundamental rights that were terminated, but Mother's *right to retain* her fundamental parental rights. And, according to the dissent, this newly identified right is not fundamental and so its infringement need not be reviewed under our strict scrutiny standard. In other words, although the dissent concedes that at least some of Mother's parental rights were fundamental before they were terminated,[94] it does not explain how we should analyze Mother's loss of those fundamental rights. So the dissent's proposed approach either ignores Mother's

---

[93] *See Jones*, 2015 UT 84, ¶ 26.

[94] *See infra* ¶ 179 (Lee, A.C.J., dissenting).

pre-existing fundamental parental rights or treats them as if her failure to strictly comply with the challenged procedural requirements transformed her fundamental rights into the less valuable right the dissent argues is at issue in this case.[95] The practical effect of this approach is that any procedural requirement triggering the forfeiture of fundamental rights is immune from strict scrutiny review because the right to retain those rights is not fundamental. For this reason, we reject the dissent's approach.

¶54 We also reject the dissent's approach because it is inconsistent with our case law. It is inconsistent for two reasons. First, it is inconsistent because it departs from the manner in which we, or the United States Supreme Court, have defined parental rights in parental rights termination cases.[96] Second, it is inconsistent because it leads to a misapplication of the doctrine of forfeiture.

---

[95] The dissent pushes back on the notion that its approach transforms the fundamental nature of the underlying parental rights into something less than fundamental. *See infra* ¶ 157 n.215 (Lee, A.C.J., dissenting) ("The fundamental nature of the underlying parental right stays the same throughout—my point is just that the right at issue here is distinct from that underlying right."). But in so doing, the dissent confirms that it is ignoring the termination of the underlying fundamental right altogether. In other words, the dissent confirms that, under its approach, state action to terminate a fundamental parental right need not satisfy strict scrutiny review so long as the parent failed to comply with a procedural requirement—a procedural requirement that need not be narrowly tailored to further a compelling state interest.

[96] Although we reject the dissent's argument because it mischaracterizes the right at issue, we note that our case law does in fact establish that Mother's right to retain her parental rights is fundamental. We have held that mothers have a fundamental right to "maintain parental ties" to their children, *In re J.P.*, 648 P.2d at 1377, to not be "deprived of parental rights without a showing of unfitness, abandonment, or substantial neglect," *id.* at 1375, "to sustain [their] relationship with [their] child," *id.* at 1372, and "to object to an adoption," *In re Adoption of J.S.*, 2014 UT 51, ¶ 2. Because our case law makes clear that Mother has a fundamental right to retain her parental rights, even under the dissent's characterization of the right at issue the dissent's argument fails.

1. The dissent mischaracterizes the right at issue in this case

¶55 We reject the dissent's argument because it is based on a mischaracterization of the right at issue. According to the dissent, the right at issue is not Mother's parental rights, but her "*right to retain* parental rights despite failing to comply with required procedure."[97] But this mischaracterizes the right at issue in two ways. First, it incorrectly defines the right by referencing the manner—forfeiture triggered by a procedural default—in which the government interfered with Mother's parental rights. Because this characterization of Mother's right would mark a fundamental departure from the way courts have traditionally defined parental rights, we reject it.

¶56 Second, the dissent mischaracterizes the right at issue by failing to account for a key distinction between the nature of the rights of an unmarried biological mother and an unmarried biological father. Throughout its opinion, the dissent relies upon cases in which we or the United States Supreme Court dealt with the provisional, or inchoate, parental rights of unmarried biological fathers. Because the case law clearly establishes that mothers have a "retained" fundamental right in their children, whereas unmarried fathers have only provisional rights that must be perfected through compliance with procedure or some other means, the dissent's argument fails.[98]

a. The dissent errs in defining the right in reference to the form of governmental interference

¶57 We first address the dissent's attempt to characterize the right at issue by referencing the procedural requirement that triggered the forfeiture of Mother's parental rights. It states that the right at issue is the "right to retain parental rights despite failing to

---

[97] *See infra* ¶ 135 (Lee, A.C.J., dissenting) (emphasis added).

[98] *In re J.P.*, 648 P.2d at 1375 (explaining that the right of a mother "not to be deprived of parental rights without a showing of unfitness, abandonment, or substantial neglect is so fundamental to our society and so basic to our constitutional order . . . that it ranks among those rights referred to in Article I, [section] 25 of the Utah Constitution and the Ninth Amendment of the United States Constitution as being *retained* by the people." (emphasis added); *see also id.* at 1372 (explaining that a mother "has a fundamental right, protected by the Constitution, to sustain [her] relationship with [her] child" (citation omitted) (internal quotation marks omitted)).

comply with required procedure."[99] To be clear the dissent does not dispute that at least some parental rights are fundamental.[100] Nor does it dispute that Mother lost all of her parental rights in this case. But, according to the dissent, the right at issue in this case is not Mother's fundamental right to parent (the right that was forfeited), but her *right to retain* that fundamental right despite her noncompliance with the challenged procedural requirement. In defining the right at issue in this way, the dissent adopts a novel approach to defining due process rights in parentage cases—an approach that effectively deprives Mother's fundamental parental rights of the heightened protection our case law would typically provide.[101]

¶58 The dissent's mischaracterization of the right in this case appears to rest on a misconception of how we typically define parental rights. By incorporating a reference to the challenged governmental interference in this case—the procedural requirements that triggered the judicially imposed forfeiture of Mother's parental rights—into its definition of the right at issue, the dissent would have us define the right at issue based on the particular form the governmental interference takes. That is not how the United States Supreme Court, nor we, have defined parental rights in the past.

¶59 Under the approach established by the Supreme Court, the nature of parental rights is defined based on (1) the status of the individual invoking the right and (2) the parental conduct to be protected. For example, in one of the Supreme Court's seminal parental rights cases, *Meyer v. Nebraska*, the Court explained that the "liberty" component of the Due Process Clause includes "the right of the individual to . . . establish a home and bring up children."[102] The Court then specifically concluded that this liberty right included the right of "*parents* to control the education of their own."[103] So the Court defined the right to parent by referring to the

---

[99] *Infra* ¶ 135 (Lee, A.C.J., dissenting).

[100] *See infra* ¶ 179 (Lee, A.C.J., dissenting).

[101] *Jones*, 2015 UT 84, ¶ 26 ("When the court has recognized a due process right it deems 'fundamental,' it consistently has applied a standard of strict scrutiny to the protection of such a right.").

[102] 262 U.S. 390, 399 (1923).

[103] *Id.* at 401 (emphasis added).

status of the individual claiming the right—the individual's status as a parent—and by referring to the conduct to be protected—the education of children.

¶60 Following *Meyer*, the Supreme Court has repeatedly looked to the status of the individual and the conduct to be protected before determining whether the individual's claim fell within the umbrella of parental rights. For example, the Court has looked to an individual's parental status in distinguishing between the rights of parents and grandparents[104] and between biological parents and foster parents.[105] And, importantly for this case, this court has distinguished between the rights of unmarried biological fathers and unmarried biological mothers.[106]

¶61 The Supreme Court has also looked to the conduct to be protected in determining that the right to parent included the right to homeschool,[107] the right "to direct the religious upbringing of [the parent's] children,"[108] and, in a long line of cases, "the fundamental right of parents to make decisions concerning the care, custody, and control of their children."[109] We also note that the Supreme Court has made clear that parental rights protect against all forms of "government interference."[110]

¶62 Thus Supreme Court precedent makes clear that we should characterize the parental right at issue in a given case by referring to (1) the status of the individual invoking the right and (2) the parental conduct to be protected. And our ultimate characterization of the right does not depend on the form of governmental interference at issue. But that is not how the dissent would have us characterize the parental right in this case.

¶63 The dissent characterizes the parental right in this case as the "right to retain parental rights *despite failing to comply with*

---

[104] *See Troxel v. Granville*, 530 U.S. 57, 65–73 (2000).

[105] *See Smith v. Org. of Foster Families For Equality & Reform*, 431 U.S. 816, 842–47 (1977).

[106] *See supra* ¶¶ 33–37.

[107] *Pierce v. Soc'y of the Sisters of the Holy Names of Jesus & Mary*, 268 U.S. 510, 534 (1925).

[108] *Wisconsin v. Yoder*, 406 U.S. 205, 233 (1972).

[109] *Troxel*, 530 U.S. at 66 (compiling cases).

[110] *Id.* at 65.

*required procedure.*"[111] So rather than asking whether *parental* conduct falls within the umbrella of protected parental rights, the dissent asks whether parents have a recognized right to be free of a particular form of *governmental* interference—in this case, a judicially imposed forfeiture of all parental rights. Accordingly, under the dissent's approach, it is the nature of the governmental interference, rather than Mother's parental status (an unmarried biological mother)[112] or the conduct in which she would like to engage (all parental conduct, or, at the very least, the maintaining of her parental rights)[113] that would define her parental right. This characterization of the right at issue would mark a significant departure from the Supreme Court's method of defining parental rights.

¶64 The dissent disagrees. Although it concedes that, under controlling precedent, parental rights are defined by the status of the individual invoking the right and the conduct to be protected, it nevertheless argues that its approach is consistent with this precedent because it has merely adopted a narrower view of "the precise form of parental conduct at issue."[114] So, according to the

---

[111] *See infra* ¶ 135 (Lee, A.C.J., dissenting) (emphasis added).

[112] *In re adoption of J.S.*, 2014 UT 51, ¶ 2 ("Unwed mothers acquire parental rights—and the accompanying right to object to an adoption—as a result of the objective manifestation of the commitment to the child that is demonstrated by their decision to carry a child to term.").

[113] *In re J.P.*, 648 P.2d at 1377 ("For the reasons and upon the precedents discussed above, we conclude that the Utah Constitution recognizes and protects the inherent and retained right of a parent to *maintain* parental ties to his or her child . . . ." (emphasis added)).

[114] *See infra* ¶ 129 (Lee, A.C.J., dissenting). The dissent argues that our approach "conflates the parental conduct that is being terminated . . . with the conduct triggering that termination." *See infra* ¶ 146 n.211 (Lee, A.C.J., dissenting). From this it appears that, in the dissent's view, the focus of our substantive due process review should not be on the state action at issue (termination of all parental rights) nor on the nature of the rights being terminated (fundamental) but on whether a parent's conduct in failing to comply with a procedural requirement was also constitutionally

(Continued)

dissent, our disagreement regarding the nature of the right at issue is merely a disagreement regarding the "level of generality at which an asserted right [should be] framed."[115]

¶65 The dissent's narrow framing fails because, in defining the "conduct" at issue by referencing the form of governmental interference at issue, the dissent fails to identify any *parental* conduct. And when we correctly identify the parental conduct at issue in this case, it is clear that we have framed the right appropriately.

¶66 The dissent explains that it has narrowly framed "the relevant conduct" by "asking whether there is a right to an exemption from procedural default."[116] Although it is unclear whether "an exemption from procedural default" constitutes *conduct* in any sense, even were we to accept it as such it would not constitute the type of *parental* conduct the Supreme Court uses to define parental rights. In identifying the relevant parental conduct in its past cases, the Supreme Court focuses on the parent's conduct directed at the parent's child, not conduct directed at, or from, the State. For example, in *Wisconsin v. Yoder*, the Supreme Court identified the relevant conduct as the parents' conduct in providing a religious education and upbringing to their children.[117] The Court explained that the case involved "the fundamental interest of parents . . . to guide the religious future and education of their children" and it explained that this right had been "established beyond debate as an enduring American tradition."[118] So, in defining the conduct at issue, the *Yoder* Court focused on the

---

protected conduct. So it follows that, under the dissent's approach, where the parent lacked a constitutionally protected right to not comply with a procedural requirement, the state is free to terminate all of the parent's constitutionally protected rights, including fundamental ones, even where the procedural requirement allegedly justifying the state's action is not narrowly tailored to further a compelling state interest (the test the state usually must pass before it terminates a fundamental right).

[115] *See infra* ¶ 146 (Lee, A.C.J., dissenting).

[116] *See infra* ¶ 146 (Lee, A.C.J., dissenting).

[117] *Yoder*, 406 U.S. at 232.

[118] *Id.*

parents' interactions with their children and asked whether the parent had a fundamental right to so interact.

¶67 In contrast to the *Yoder* court's framing of the relevant parental conduct, the dissent frames the relevant conduct by focusing on Mother's interactions with the State. The dissent explains that Mother does not have a fundamental right to be free of the consequences of a State-imposed forfeiture of parental rights because she has failed to "establish a tradition of protecting parental rights despite a procedural default." This is inconsistent with the Supreme Court's approach in *Yoder* and other parental rights cases.

¶68 Had the *Yoder* Court defined the right in that case, as the dissent does here—by defining it in terms of the parent's interactions with the State—it would have focused on whether the "American tradition" had established a parent's right to be free from criminal prosecution despite the parent's violation of a legislative enactment. So the dissent's focus on the form of governmental interference at issue is clearly inconsistent with the Court's framing of the parental right in *Yoder*.

¶69 The dissent also errs in attempting to narrow the scope of the relevant parental conduct in this case. Although the dissent correctly notes that the level of generality at which an asserted right is framed may be an outcome-determinative issue in some cases, its suggestion that the level of generality is an issue in this case conflicts with controlling precedent.

¶70 The level of generality at which an asserted right is framed may properly be considered an unresolved issue only where a party argues that the Due Process Clause protects someone whose (1) status or (2) conduct had not previously received constitutional protection. For example, in *Smith v. Organization of Foster Families For Equality and Reform*, the Supreme Court considered whether the "liberty" interest protected by the Due Process Clause extended to individuals in "their *status* as foster parents."[119] In considering this question, the Court considered the differences between biological families, which are created without state involvement, and foster families, which "have their origins in an arrangement in which the State has been a partner from the outset."[120] Reasoning that the "contours" of the liberty interest protected by the Due Process

---

[119] 431 U.S. at 839 (emphasis added).

[120] *Id.* at 845.

Clause did not have its source "in state law," "but in intrinsic human rights, as they have been understood in this Nation's history and tradition," the Court concluded that the "foster parents" liberty interest received only the "most limited constitutional" protection. So, in *Smith*, the Supreme Court resolved a novel question regarding the constitutional protections provided to someone with a particular parental status by narrowing—to exclude foster parents—the parental status needed to receive full protection under the Due Process Clause.

¶71 The same is true of the Court's decision in *Michael H. v. Gerald D.*, the case upon which the dissent's level-of-generality argument principally relies.[121] The dissent relies on this case to argue that the Supreme Court "has never conclusively established a governing standard" for defining the level of generality at which an asserted right is framed.[122] And, for this reason, the dissent states that it is free to define the right at issue as it does. But the level-of-generality discussion in *Michael H.* does not support the dissent's proposed framing of the right in this case.

¶72 In *Michael H.*, an unmarried father asserted a fundamental parental interest in a daughter who was born into a woman's existing marriage with another man.[123] So, as in *Smith*, the Court in *Michael H.* had to decide whether the "liberty" interest protected by the Due Process Clause extended to an individual whose parental *status* had not previously been recognized as deserving full due-process protection.[124] The justices who joined the plurality opinion opted to construe the status of the unmarried father narrowly—as an unmarried father of a daughter born into a woman's existing marriage with another man. The dissent, in contrast, would have construed the status of the father in more general terms—as a parent or father. So the competing opinions in

---

[121] 491 U.S. 110 (1989).

[122] *See infra* ¶ 147 (Lee, A.C.J., dissenting).

[123] 491 U.S. at 125.

[124] *Id.*, 491 U.S. at 124 ("Thus, the legal issue in the present case reduces to whether the relationship between persons in the situation of Michael and Victoria [(an unmarried father's relationship with his daughter, who was born while her mother was married to another man)] has been treated as a protected family unit under the historic practices of our society, or whether on any other basis it has been accorded special protection.").

*Michael H.* suggest that where an individual asserts a fundamental parental right based on a parental status (or parental conduct) that *had not previously* been recognized as deserving constitutional protection, the level of generality at which the court defines the parental status (or conduct) may be an outcome-determinative issue.

¶73  But the level-of-generality problem discussed in *Michael H.* is not an issue in this case, because our case law has already established the level of protection the Due Process Clause provides to a biological mother's parental right in a parental rights termination case. In fact, the dissent concedes that Mother's parental status—as a biological mother—affords her certain, fundamental parental rights. The dissent's only disagreement, therefore, is over our broad characterization of the parental conduct at issue. But our case law makes clear that, where the government is attempting to terminate all parental rights, courts should define the parental right broadly to encompass the full spectrum of constitutionally protected parental conduct inherent in the parent-child relationship. In other words, the "parental conduct" at issue in a parental rights termination case encompasses the entire bundle of parental rights, including the parent's fundamental rights to homeschool,[125] "to direct the religious upbringing of [the parent's] children,"[126] "to make decisions concerning the care, custody, and control of their children,"[127] and any other right that will be terminated as a result of the State's termination proceeding.

¶74  That the conduct at issue in parental rights termination cases encompasses the full spectrum of parental conduct is made apparent in the Supreme Court's decision in *Stanley v. Illinois*.[128] In that case, the Court determined whether the State of Illinois' "method of procedure," which created a presumption that unmarried fathers were unfit parents, violated principles of due process.[129] As a result of this procedural rule, the father in the case lost his parental rights in his children. In resolving this case, the Court explained that the "issue at stake [was] the dismemberment

---

[125] *Pierce*, 268 U.S. at 534.

[126] *Yoder*, 406 U.S. at 233.

[127] *Troxel*, 530 U.S. at 66 (compiling cases).

[128] 405 U.S. 645 (1972).

[129] *Id.* at 647.

of [the father's] family."[130] And throughout the opinion, it referred to the right or interest at issue variously as the interest "of a man in the children he has sired and raised,"[131] as the "rights to conceive and to raise one's children,"[132] as the right of "custody, care and nurture of the child,"[133] and as an interest in the "integrity of the family unit."[134] So the Court did not narrowly frame the right by defining it as a right to be free from a particular procedural rule, as the dissent would have us do here. Instead, it described the right broadly, and more accurately, to encompass all of the interests in parental conduct the father would have lost were the state's "method of procedure" upheld.

¶75 The Court treated the relevant parental conduct similarly in *Quilloin v. Walcott*.[135] There the issue presented was once again whether a state could "force the breakup of a natural family" through a procedural mechanism that provided fewer protections to unmarried fathers than it did to mothers.[136] Although, based on the father's unmarried *status*, the Court ultimately upheld this procedure as constitutional, the Court consistently referred to the interest at issue in the case as an interest to engage generally in parental conduct.[137] So the decision in *Quilloin* likewise suggests that, in parental rights termination cases, we must take a broad view of the relevant parental conduct.[138]

¶76 Our past parental rights termination cases have also described the parental conduct in broad terms. For example, in one

---

[130] *Id.* at 658.

[131] *Id.* at 651.

[132] *Id.*

[133] *Id.*

[134] *Id.*

[135] 434 U.S. 246 (1978).

[136] *Id.* at 255 (citation omitted).

[137] *Id.* (describing the parental right as an interest in having a "relationship between parent and child").

[138] *See also Lehr v. Robertson*, 463 U.S. 248, 256–58 (1983) (discussing the parental right variously as an interest in the "intangible fibers that connect parent and child," "family relationships," and as including fundamental rights previously recognized by Supreme Court precedent).

of our earliest parental rights termination cases, *In re J.P.*, we emphasized that the case "involve[d] a permanent termination *of all parental rights*."[139] And we explained that "all parental rights" included fundamental rights "to sustain [a parent's] relationship with his [or her] child," "to direct the upbringing and education of children," and a right in "the custody, care and nurture of the child."[140] So, consistent with the Supreme Court precedent, we characterized the type of "parental conduct" at issue in parental rights termination cases in broad terms.

¶77 Following our decision in *In re J.P.*, our decisions in parental rights termination cases have consistently referred to the relevant parental conduct in broad terms. For example, in *Wells v. Children's Aid Society of Utah*, we stated broadly that the "relationship between parent and child is protected by the federal and state constitutions."[141] And in *In re adoption of J.S.*, we acknowledged "a fundamental right for a mother not to lose her rights to her child absent proof of unfitness, abandonment, or neglect,"[142] as well as the fundamental parental interest that a father has "in the children he has sired and raised."[143] We also cited our decision in *In re J.P.* for the proposition that the "integrity of the family and the parents' inherent *right and authority to rear their own children* have been recognized as fundamental axioms of Anglo-American culture, presupposed by all our social, political, and legal institutions."[144] As these cases illustrate, in parental rights termination cases, we have consistently described the relevant parental conduct protected by the Due Process Clause in broad terms.[145] And in defining parental conduct, we have never defined

---

[139] 648 P.2d at 1366.

[140] *Id.* at 1372.

[141] 681 P.2d at 202.

[142] 2014 UT 51, ¶ 38.

[143] *Id.* ¶ 40 (citation omitted).

[144] *Id.* ¶ 39 (emphasis added).

[145] The dissent relies on our decision in *In re adoption of J.S.* to argue that we must narrowly frame the relevant "conduct" at issue. But the narrow framing at issue in that case did nothing to limit the scope of relevant parental conduct. Instead, it more narrowly construed the parental status—to exclude unmarried fathers who

(Continued)

it, as the dissent does in this case, by referencing the particular form of governmental interference. Accordingly, the level-of-generality problem identified by the dissent is not at issue in this case, and the dissent's purported framing of the relevant conduct in this case is inconsistent with our case law.

¶78 In sum, Supreme Court precedent makes clear that parental rights should be characterized based on (1) the status of the individual invoking the right and (2) the parental conduct to be protected. The dissent's characterization of the right, in contrast, defines the right in reference to the form of governmental interference. In other words, rather than asking whether Mother, as K.T.B.'s biological mother, has a constitutionally protected interest in engaging in any of the conduct inherent in the parent-child relationship, the dissent asks whether Mother has a constitutionally protected interest in being free from a particular form of governmental interference. Because such a characterization of the right at issue is inconsistent with our case law, and would lead us to entirely overlook the substantial parental interests at the heart of this case, we reject it.

b. The dissent errs in failing to distinguish between the constitutionally protected status of biological mothers and the provisional parental status of unmarried biological fathers

¶79 Additionally, we also reject the dissent's characterization of the right at issue in this case because it fails to account for a key distinction between the nature of the rights of a biological mother and the rights of an unmarried biological father. As we have

---

had not perfected their parental rights—deserving full due process protection. *See id.* ¶ 2 ("Unwed mothers acquire parental rights—and the accompanying right to object to an adoption—as a result of the objective manifestation of the commitment to the child that is demonstrated by their decision to carry a child to term. An unwed father's legal obligation to file the paternity affidavit is a rough counterpart to the mother's commitment."). So our decision in *In re adoption of J.S.* merely reaffirmed an important distinction, based on parental status, between mothers and unmarried fathers that had previously been established in our case law. *See In re J.P.*, 648 P.2d at 1374–75 (distinguishing between the variation in the protections afforded unwed fathers before noting that, "[i]n contrast, no similar variation exists among mothers who are unwed").

discussed, parental rights should be defined based, in part, on the status of the individual invoking the right. And our case law has firmly established a clear distinction between the parental status of mothers and unmarried fathers. But, despite this, the dissent attempts to apply unmarried father cases to the facts of this case. Because the case law clearly establishes that mothers have a "retained" fundamental right in their children, whereas unmarried fathers have only provisional rights that must be perfected through compliance with procedure or some other means, the dissent's argument fails.[146]

¶80 We first addressed the distinction between the nature of the parental rights of a mother and an unmarried biological father in *In re J.P.*[147] In that case, we considered an unmarried biological mother's challenge to a statute that permitted a court to "decree an involuntary termination of all parental rights solely on the basis of a finding that such termination will be in the child's best interest."[148] We began our review of the mother's challenge by summarizing the United States Supreme Court's decisions in *Stanley* and *Quilloin* as standing for the proposition that "[s]ome variation [in the protection provided by the Due Process Clause] exists among unwed fathers."[149]

¶81 So, under the rule established in those decisions, we explained that unwed fathers "who have fulfilled a parental role over a considerable period of time are entitled to a high degree of protection" but "unwed fathers whose relationships to their children are merely biological or very attenuated may, in some

---

[146] *In re J.P.*, 648 P.2d at 1375 (explaining that the right of a mother "not to be deprived of parental rights without a showing of unfitness, abandonment, or substantial neglect is so fundamental to our society and so basic to our constitutional order . . . that it ranks among those rights referred to in Article I, [section] 25 of the Utah Constitution and the Ninth Amendment of the United States Constitution as being *retained* by the people." (emphasis added) (citation omitted)); *see also id.* at 1372 (explaining that a mother "has a fundamental right, protected by the Constitution, to sustain [her] relationship with [her] child" (citation omitted) (internal quotation marks omitted)).

[147] *Id.* at 1374–75.

[148] *Id.* at 1374 (internal quotation marks omitted).

[149] *Id.*

circumstances, be deprived of their parental status merely on the basis of a finding of the 'best interest' of the child."[150] Thus the nature of an unmarried father's right may vary from case to case depending on what the father has done to develop a relationship with his child.[151]

¶82  But in contrast to unwed fathers, we explained that "no similar variation exists among mothers who are unwed" and that "all unwed mothers are entitled to a showing of unfitness before being involuntarily deprived of their parental rights."[152] And we explained that this right "is so fundamental to our society and so basic to our constitutional order . . . that it ranks among those rights . . . *retained* by the people."[153]

¶83  So our discussion of parental rights in *In re J.P.* makes clear that only unmarried fathers need comply with procedural mechanisms to perfect their parental rights. In other words, the parental status of all biological mothers, whether married or unmarried, gives mothers a right to not "be deprived of parental rights without a showing of unfitness, abandonment, or substantial neglect," and this right is not contingent upon compliance with any procedural requirement that the state may establish. Accordingly, the dissent's discussion of Mother's rights in this case is inconsistent with our holding in *In re J.P.*

¶84 The dissent's discussion of Mother's rights is also inconsistent with our holding in *In re Adoption of J.S.*[154] As our discussion of *In re J.P.* above makes clear, an unmarried father's parental right is "merely provisional" until the father takes steps to perfect it. And in *In re Adoption of J.S.*, we considered an unwed

---

[150] *Id.* at 1375.

[151] We note that in later cases we have clarified that an unmarried father may perfect his right by complying with certain provisions in the Adoption Act, which include such requirements as filing an affidavit of paternity. *See, e.g., In re Adoption of J.S.*, 2014 UT 51, ¶ 2 (explaining that the provision describing a paternity affidavit "prescribes the requirements that an unwed father must meet in order to secure the right to assert his parental rights and object to an adoption").

[152] *In re J.P.*, 648 P.2d at 1375.

[153] *Id.* (emphasis added).

[154] 2014 UT 51.

father's challenge to provisions in the Adoption Act that provided a procedural mechanism for unwed fathers to perfect their parental rights.[155] Echoing the distinction between mothers and unmarried biological fathers we made in *In re J.P.*, we explained that "[u]nwed mothers acquire parental rights—and the accompanying right to object to an adoption—as a result of the objective manifestation of the commitment to the child that is demonstrated by their decision to carry a child to term."[156] But with unmarried fathers there is no such "objective manifestation," so the father's "legal obligation to file the paternity affidavit" described in the Adoption Act serves as "a rough counterpart to the mother's [objective] commitment" to her child.[157] Based on this distinction, we stated that a child may be placed for adoption only "if the mother and father *choose* to waive [their parental] right[s]—or *in the case of a father*, fails to assert the right by filing the paternity affidavit in a timely fashion."[158] So our decision in *In re Adoption of J.S.* recognized that the vested nature of a mother's parental rights meant that only unmarried fathers could lose their rights to their children by failing to comply with state-instituted procedure.

¶85 With this distinction in mind, we proceeded to the merits of the unmarried father's claim. After noting that the father had not brought a procedural due process claim, we then proceeded to analyze the Adoption Act's paternity affidavit requirement under a substantive due process analysis.[159] In so doing, we noted that procedural limitations "may be challenged on either procedural or substantive due process grounds."[160] And that a substantive due process claim may be brought where otherwise fair procedures are

---

[155] *Id.* ¶ 2.

[156] *Id.* By "saying that the established procedures determine how and whether [Mother's parental] right is preserved," the dissent fails to account for this key distinction. *Infra* ¶ 205 (Lee, A.C.J., dissenting).

[157] *In re Adoption of J.S.*, 2014 UT 51, ¶ 2.

[158] *Id.* (emphases added).

[159] *Id.* ¶ 6.

[160] *Id.* ¶ 22 (emphases omitted).

alleged to be unfair in light of the "fundamental or important" right they foreclose.[161]

¶86 We then analyzed the nature of the right of the unmarried father. Although we recognized that we had already determined that the parental rights of mothers are fundamental (in *In re J.P.*), we clarified that this labeling had been limited to mothers because of "extensive historical evidence of the 'deeply rooted' nature of [a mother's] right."[162] A plurality of the court then noted that the father in the case had not made the "required showing of 'deeply rooted' history and tradition [that] was made in *J.P.* [regarding the rights of mothers],"[163] and so, absent such a showing, the father's substantive due process claim would be reviewed on the "deferential, fallback standard of rationality or arbitrariness."[164] Accordingly, our discussion of parental rights in *In re Adoption of J.S.* clarified that the parental rights of mothers are fundamental, requiring strict scrutiny analysis, but the parental rights of unmarried fathers are merely provisional, absent some future showing of "extensive historical evidence" that unmarried father's rights are likewise fundamental.

¶87 As this discussion of *In re J.P.* and *In re Adoption of J.S.* demonstrates, our case law has established a significant distinction between the parental rights of unmarried biological mothers and unmarried biological fathers. Under this distinction, the fundamental parental rights of a mother are not contingent on compliance with any procedural requirements that may be imposed by the state. Because the dissent's characterization of the right at issue, and its discussion of our previous cases, fails to adequately account for this significant distinction, its argument fails.

¶88 In fact, even though the dissent concedes that Mother, based on her parental status as a biological mother, did not need to strictly comply with the procedures in the Adoption Act to render her parental rights fundamental, it nevertheless argues that strict compliance was necessary to *preserve* the fundamental nature of her rights. So the dissent would create a novel framework in which a

---

[161] *Id.*

[162] *Id.* ¶ 39.

[163] *Id.* ¶ 54.

[164] *Id.* ¶ 56.

right, although concededly perfected and fundamental, can lose the protection of strict scrutiny review where the holder of the right fails to take on-going steps to preserve it. But the dissent cites no authority for such a framework. And our case law clearly refutes it.

¶89 Our case law makes clear that the fundamental parental right is a "retained"[165] right that stems from "nature and human instinct," which is "chronologically prior" to "state or federal statutory law."[166] It also states that the right includes a fundamental right for parents to "sustain" their relationships with their children.[167] If these phrases mean anything, they mean that the fundamental nature of a recognized parental right does not lose its fundamental status because of a failure to comply with a procedural requirement instituted by the State.

¶90 To be clear, we are not suggesting that the state can never terminate a fundamental parental right based on the parent's failure to comply with a statutory requirement. Instead, we are merely reaffirming the firmly established principle that where the state intervenes "to terminate [a parent-child] relationship," that intervention, whether accomplished through the imposition of a procedural requirement or some other means, "must be accomplished by *procedures* meeting the requisites of the Due Process Clause."[168] Applying this principle in this case, we have concluded that the State's termination of mother's fundamental parental rights, based on her failure to strictly comply with a State-created procedural requirement, would be constitutional only if the procedural requirement is narrowly tailored to achieve a compelling state interest. The dissent's criticism of this straightforward approach to substantive due process is misplaced.

¶91 Because the dissent fails to adequately account for a key distinction our case law has established between the status of biological mothers and unmarried biological fathers, it mischaracterizes the right at issue in this case. And the dissent's attempts to defend this mischaracterization by proposing a theoretical framework in which the state could deprive an individual's fundamental rights of strict-scrutiny protection

---

[165] *In re J.P.*, 648 P.2d at 1375.

[166] *Id.* at 1373.

[167] *Id.* at 1372.

[168] *Lehr*, 463 U.S. at 258 (emphasis added) (citation omitted).

through the imposition of a preservation requirement is likewise inconsistent with our case law.

¶92 In sum, we reject the dissent's characterization of the right at issue in this case because it incorrectly defines the right at issue based on the particular form the governmental interference takes and because it fails to adequately distinguish between the "retained" and fundamental nature of a mother's parental rights and the merely provisional nature of an unmarried father's rights.

2. The dissent misapplies the doctrine of forfeiture in this case

¶93 The dissent's mischaracterization of the right at issue in this case is also problematic because it leads to a misapplication of the doctrine of forfeiture to Mother's due process claim. As discussed, the dissent argues that the right at issue in this case is not Mother's indisputably fundamental right to parent, but her *right to retain* that fundamental right despite her noncompliance with the challenged procedural requirement. Based on this characterization, the dissent argues that we have established a new right "to flout a legal filing requirement but avoid the normal consequence of such a move"[169] and that, under our approach, a fundamental right can never "be forfeited due to a procedural default."[170] But the dissent misreads our opinion. And its proposed alternative approach misapplies the doctrine of forfeiture in this case.

¶94 Contrary to the dissent's characterization of our opinion, we are not suggesting that the "mere possession of a fundamental right . . . forever insulate[s] the mother from ever losing that right."[171] And we are not saying that fundamental rights are entirely "beyond the procedural reach of the State's regulatory authority."[172] Instead, we are merely reaffirming the firmly established principle that where the state intervenes "to terminate [a parent-child] relationship," that intervention, whether accomplished through the imposition of a procedural requirement or some other means, "must be accomplished by *procedures* meeting

---

[169] *See infra* ¶ 126 (Lee, A.C.J., dissenting).

[170] *See infra* ¶ 133 (Lee, A.C.J., dissenting).

[171] *See infra* ¶ 133 n.208 (Lee, A.C.J., dissenting).

[172] *See infra* ¶ 163 (Lee, A.C.J., dissenting).

the requisites of the Due Process Clause."[173] In other words, we are stating only that the imposition of unconstitutional procedures, as applied to the fundamental right in this case, is beyond the regulatory authority of the State.

¶95 Based on this principle, we have analyzed the facts of this case to determine whether the procedural mechanism through which the state terminated Mother's fundamental rights was constitutional. And, after a straightforward application of the Supreme Court's strict scrutiny standard, we have determined that the strict compliance provision in section 110 of the Adoption Act was unconstitutionally applied in this case. In other words, we are saying that the enforcement of the strict compliance requirement violated the Due Process Clause because it triggered the loss of fundamental rights even though it was not necessary to further the State's compelling adoption-related interests in this case. And we are saying that because the strict compliance provision violated the Due Process Clause, as it was applied to Mother, it cannot justify the State's termination of Mother's parental rights.

¶96 In contrast, the dissent argues that the state did not terminate any fundamental rights in this case, because Mother forfeited her rights when she failed to comply with the procedural requirements of the Act. But the dissent's argument assumes, without analysis, that the procedural requirement that triggered Mother's default was constitutional. In other words, the dissent avoids the central question presented by Mother's substantive due process claim.

¶97 So, in effect, the dissent argues that the procedural requirement that authorized the state to terminate Mother's fundamental parental rights is constitutional because Mother failed

---

[173] *Lehr*, 463 U.S. at 258 (emphasis added) (citation omitted). The dissent cites two cases, *Yakus v. United States*, 321 U.S. 414, 444 (1944) and *State v. Rettig*, 2017 UT 83, ¶¶ 15, 17, 416 P.3d 520, for the proposition that constitutional rights may be forfeited through procedural default. We agree with this assertion. But neither *Yakus* nor *Rettig* stand for the proposition that a party can be barred from challenging an unconstitutional procedural requirement due to that party's failure to comply with that unconstitutional requirement. That proposition would be inconsistent with "the longstanding law of procedural default."

to comply with that procedure. This approach is not only circular, it is inconsistent with the doctrine of forfeiture.

¶98 Forfeiture "is not appropriate when it is inconsistent with the provision creating the right sought to be secured."[174] The relevant provision in this case is the Due Process Clause of the Constitution. As we explained above, the substantive component of the Due Process Clause allows plaintiffs to challenge the "fairness of [a] procedural bar or limitation, on the ground that the right foreclosed is so fundamental or important that it is protected from extinguishment."[175] And Due Process Clause case law has further clarified that "fundamental" rights may be extinguished through the operation of procedural provisions only where those provisions survive strict scrutiny review.[176] So, in other words, the substantive component of the Due Process Clause protects individuals from being deprived of fundamental rights through the operation of procedures that are not narrowly tailored to further

---

[174] *New York v. Hill*, 528 U.S. 110, 116 (2000). Although the Supreme Court in *Hill* addresses the issue of express waiver, rather than forfeiture, the principle for which we cite *Hill* applies equally in forfeiture cases. Waiver is sometimes used as an umbrella term encompassing all statements and acts that result in any loss of a right without a disposition on the merits. And we note that the *Hill* Court supported its statement—that "waiver is not appropriate when it is inconsistent with the provision creating the right sought to be secured"—by citing a case that is best characterized as a forfeiture case. *Id.* at 116 (citing *Crosby v. United States*, 506 U.S. 255, 258–59 (1993) (holding that a criminal defendant's right to be present at the beginning of trial cannot be forfeited through a failure to be present)).

[175] *In re B.Y.*, 2015 UT 67, ¶ 41 (alteration in the original) (internal quotation marks omitted). So, by arguing that Mother is precluded from challenging the fairness of procedural bars on substantive due process grounds, the dissent would have us implicitly overturn the rule we established in *In re B.Y.*

[176] *See, e.g., Quilloin,* 434 U.S. at 254–55 (applying a substantive due process analysis to a challenge of a procedural provision); *Stanley*, 405 U.S. at 650 (applying a substantive due process analysis to an Illinois "procedure").

compelling state interests.[177] And, as our analysis above demonstrates, the procedural requirements that triggered the loss of Mother's fundamental parental rights were not narrowly tailored. So applying the doctrine of forfeiture to defeat Mother's substantive due process claim in this case would be inconsistent with the Due Process Clause.

¶99 Because forfeiture "is not appropriate when it is inconsistent with the provision creating the right sought to be secured,"[178] and the dissent's proposed application of forfeiture in this case would be inconsistent with the substantive component of the Due Process Clause, we reject the dissent's forfeiture argument. And in so doing, we clarify that the doctrine of forfeiture does not prevent an individual from challenging the constitutionality of a procedural requirement based on the individual's failure to comply with that procedural requirement.

¶100   Accordingly, we reject the arguments the dissent raises for two reasons. First, we reject them because the dissent mischaracterizes the right at issue; second, we reject them because

---

[177] *See also Stanley*, 405 U.S. at 647 (applying the strict scrutiny standard where a state terminated a fundamental right through a "method of procedure"). The dissent states that strict scrutiny need not be applied in every instance in which a state terminates parental rights, but the only support for this position comes from cases far outside the parental rights field of law. The dissent argues that the "'fundamental' nature of a given right is not alone enough to trigger strict scrutiny of any procedural regulation of that right." *See infra* ¶ 159 (Lee, A.C.J., dissenting). It then cites cases involving abortion rights, the right to free speech, the right to free exercise of religion, and the right to vote. *See infra* ¶ 159 (Lee, A.C.J., dissenting). But we do not view these cases, in which the Supreme Court articulated exceptions to the general rule based on the unique nature of the right at issue, to be relevant to this case. This case deals with the termination of all parental rights of a biological mother. And controlling precedent has clearly set forth the standard of scrutiny to be applied where a state attempts to terminate all of a biological mother's fundamental parental rights. For this reason, the cases the dissent cites from other areas of law are unpersuasive.

[178] *Hill*, 528 U.S. at 116.

the dissent misapplies the doctrine of forfeiture to the facts of this case.

¶101   In sum, Mother has fundamental parental rights. The district court severed those rights because Mother failed to strictly comply with the procedural requirements of section 110. Because the strict compliance provision in section 110 was not narrowly tailored, we hold that the strict compliance provision is unconstitutional as applied in this case.

### IV. J.N.'s Motion to Intervene was Properly Denied

¶102   We now turn to J.N.'s claim. He argues that he should have been allowed to intervene in the adoption proceedings after his marriage to Mother was judicially recognized. Although J.N. admits that he is not the biological father, he argues that due to his common-law marriage to Mother, he is K.T.B.'s presumptive father[179] and therefore was entitled to notice of the adoption petition under section 120 of the Adoption Act. Because the Adoptive Parents did not serve him with notice, he contends that his motion to intervene was timely, and he was therefore entitled to intervene in the adoption proceeding under Rule 24 of the Utah Rules of Civil Procedure.[180] We disagree.

¶103   At the time the Adoptive Parents filed their adoption petition, J.N.'s marriage to Mother had not been legally recognized. After the court barred Mother from the adoption proceeding, J.N. sought this recognition by filing an action in a different district court. He succeeded, and the second district court recognized his marriage as beginning "on or about June 16, 2010," or three months

---

[179] "A man is presumed to be the father of a child if . . . he and the mother of the child are married to each other and the child is born during the marriage." UTAH CODE § 78B-15-204(1)(a).

[180] UTAH R. CIV. P. 24 ("Upon timely application anyone shall be permitted to intervene in an action: (1) when a statute confers an unconditional right to intervene; or (2) when the applicant claims an interest relating to the property or transaction which is the subject of the action and he is so situated that the disposition of the action may as a practical matter impair or impede his ability to protect that interest, unless the applicant's interest is adequately represented by existing parties.").

before the birth of K.T.B.[181] With this judicial decree in hand, J.N. then filed his motion to intervene in this case. The district court denied his motion, in part, because it was untimely.

¶104   On appeal, J.N. argues that at the time the adoption petition was filed, his marriage to Mother—which, according to the subsequent judicial marriage decree, began on June 16, 2010—created a presumption that he is K.T.B.'s father, thereby entitling him to notice of the adoption. He reasons that because he never received notice of the adoption proceeding, section 110's thirty-day time period to intervene was never triggered. Thus he argues his motion to intervene was timely, and he was therefore entitled to intervene under rule 24.

¶105   In support of his argument J.N. cites our decision in *Whyte v. Blair*.[182] In *Whyte* we held that once a common-law marriage is legally recognized it can have retroactive legal effect from the time the marriage was entered.[183] But contrary to J.N.'s assertion, *Whyte* did not answer the question of whether a common-law marriage entitles a couple to state-recognized marital rights in the absence of a judicial decree. That question is answered by the plain language of Utah Code section 30-1-4.5, Utah's common-law marriage statute.

¶106 Under section 30-1-4.5, a person may seek legal recognition of a common-law marriage by obtaining a judicial or administrative order. Once this occurs, a common-law marriage "is treated as any other marriage for all purposes."[184] And as our decision in *Whyte* makes clear, these marital rights may apply retroactively once they are recognized.[185] But the plain language of two provisions within section 30-1-4.5 also makes it clear that the marital rights stemming from a common-law marriage are merely

---

[181] In their opposition on appeal, the Adoptive Parents allege that J.N. failed to notify the second district court of the adoption pending in this case, as required by rule 100 of the Utah Rules of Civil Procedure. Although such a failure could seriously undermine the validity of J.N.'s marriage decree, we do not address it here because the marriage decree has not been appealed.

[182] 885 P.2d 791 (Utah 1994).

[183] *Id.* at 793–94.

[184] *Id.* at 793.

[185] *See generally id.*

conditional unless they have been legally recognized through a judicial or administrative order.

¶107 First, section 30-1-4.5(1) states that a common-law marriage "shall be legal and valid *if* a court or administrative order establishes that it arises out of a contract between a man and a woman" who satisfy certain common-law marriage requirements.[186] Thus, by negative implication, a common-law marriage is not legal and valid in the absence of such an order.

¶108 Second, section 30-1-4.5(2) states that "[t]he determination or establishment of a [common-law] marriage shall occur during the relationship . . . or within one year following the termination of that relationship." So if a couple terminates a relationship that would have qualified as a common-law marriage, but fails to obtain judicial recognition of that relationship within one year of termination, then any marital rights the couple could have enjoyed through legal recognition are forfeited. In other words, if a couple fails to perfect marital rights stemming from a common-law marriage within the one-year limitations period, it is as if the marriage never occurred.

¶109 These two aspects of section 30-1-4.5 suggest that the rights stemming from a common-law marriage must be perfected through a judicial proceeding before those rights take legal effect. This makes sense. "[M]arriage is a keystone of our social order."[187] For this reason, when "a couple vows to support each other, so does society pledge to support the couple, offering symbolic recognition and material benefits to protect and nourish the union."[188] In this way, marital status serves as a basis for the conferral of a number of "governmental rights, benefits, and responsibilities," including rights in the areas of adoption and child custody.[189] But the state cannot confer these rights on a married couple unless the married couple makes their marital status known to it. And the inverse is also true: a married couple living in an as-of-yet unrecognized common-law marriage cannot obligate the state to respect rights

---

[186] UTAH CODE § 30-1-4.5(1) (emphasis added).

[187] *Obergefell v. Hodges*, 135 S. Ct. 2584, 2601 (2015).

[188] *Id.*

[189] *Id.*; *see also Sanchez v. L.D.S. Soc. Servs.*, 680 P.2d 753, 755 (Utah 1984) ("Marriage is the institution established by society for the procreation and rearing of children.").

stemming from that marriage until it has been legally recognized.[190] But this is essentially what J.N. is asking the court to do.

¶110 At the time of the Adoptive Parents' adoption petition, J.N.'s marital rights, including rights to notice or to intervene in the adoption as a presumptive father, had not been legally recognized by the State.[191] Additionally, because J.N. admits that he is not K.T.B.'s biological father, he also did not have any rights in the adoption as K.T.B.'s putative father.[192] J.N.'s lack of any legally recognized rights in K.T.B. at the time the Adoptive Parents filed their petition ultimately defeats his claim.

---

[190] *See State v. Holm*, 2006 UT 31, ¶ 32, 137 P.3d 726 ("[Because] a marriage license represents a contract between the State and the individuals entering into matrimony . . . [the defendant], as a result of his [unsanctioned marriage] ceremony with [his alleged spouse], [is] not entitled to any legal benefits attendant to a state-sanctioned marriage.").

[191] Similar to our holding in *Scott v. Scott*, we find that the relevant date for consideration is the date the adoption petition was filed. 2017 UT 66, ¶ 30, 423 P.3d 1275 (requiring an ex-spouse to be cohabitating with a boyfriend at the time the petition to terminate alimony was filed); *see also Grupo Dataflux v. Atlas Glob. Grp., L.P.*, 541 U.S. 567, 571 (2004) ("[J]urisdiction of the court depends upon the state of things at time of the action brought. . . . . [The time-of-filing rule] measures all challenges to subject-matter jurisdiction premised upon diversity of citizenship against the state of facts that existed at the time of filing." (internal quotation marks omitted)); *Int'l Trading Corp. v. Edison*, 109 F.2d 825, 826 (D.C. Cir. 1939) (requiring a "duty [to] exist at the time of filing a petition for mandamus"); *Koch v. Carmona*, 643 N.E.2d 1376, 1381 (Ill. App. Ct. 1994) (evaluating an attorney's conduct "under the circumstances existing at the time of the filing").

[192] *See In re Baby Girl T.*, 2012 UT 78, ¶ 11, 298 P.3d 1251 ("[A]n unwed father's biological connection to his child does not automatically grant him a fundamental constitutional right to parenthood. Rather, an unwed father has a provisional right to parenthood, and due process requires only that an unwed father have a meaningful chance to preserve his opportunity to develop a relationship with his child." (citation omitted) (internal quotation marks omitted)).

¶111 The crux of J.N.'s argument is his assertion that the Adoptive Parents were obligated to provide him with notice as a presumptive father. According to him, their failure to do so prevented the Adoption Act's thirty-day intervention window from beginning and so his motion to intervene, filed nearly four months after the petition, was timely. But because he did not have any presumptive rights at that time, neither the Adoptive Parents nor anyone else was obligated to serve notice on him. So we must determine whether J.N., as merely a potential presumptive father, had a duty to timely intervene in the adoption proceeding despite the lack of notice. He did.

¶112 Although the Adoption Act does not establish requirements with which a merely potential presumptive father must comply before intervening in an adoption, we find that certain requirements the Adoption Act imposes on a potential biological father are applicable. Under the Adoption Act, an unmarried biological father "has a duty to protect his own rights and interests" by filing the necessary documents before relevant deadlines.[193] If he does so, he preserves a right to notice and to intervene in the adoption.[194] But until then, he "is considered to be on notice that . . . an adoption proceeding regarding the child may occur."[195] Although the method for protecting his rights differs from that of an unmarried biological father,[196] placing the burden

---

[193] UTAH CODE § 78B-6-110(1)(a)(ii).

[194] *Id.* § 78B-6-110(3).

[195] *Id.* § 78B-6-110(1)(a)(i); *see also In re Baby Girl T.*, 2012 UT 78, ¶ 11 ("The Act's requirements operate under the presumption that an unwed father knows that his 'child may be adopted without his consent unless he strictly complies with the provisions of [the Act].'" (alteration in original) (citing UTAH CODE § 78B-6-102(6)(f))).

[196] We note that a potential presumptive father could protect his right to notice of an adoption by obtaining judicial recognition of his common-law marriage *before* an adoption petition is filed or he could protect his right to intervene by obtaining a judicial marriage decree, either within the adoption proceeding or as part of another case, *within* thirty days of the date on which the adoption petition was filed. Additionally, we note that in most cases section 110(2)(g) would guarantee a potential presumptive father the right to notice even in the absence of a judicial marriage decree because he would

(Continued)

on J.N., as a potential presumptive father with no legally recognized parental rights, is equally appropriate.

¶113 Due to the unperfected nature of J.N.'s presumptive parental rights, he was responsible to take necessary steps to preserve his rights in the adoption. Had he done so by obtaining judicial recognition of his marriage before the Adoptive Parents filed their adoption petition, the Adoptive Parents would have been obligated to provide him with notice and he would have had thirty days to file a motion to intervene upon receipt of such notice.[197] But in the absence of a legally recognized marriage, the Adoptive Parents had no such obligation, and so J.N. was considered to be on notice of the adoption proceeding once the Adoptive Parents filed their petition.[198] This presumed notice initiated the Adoption Act's thirty-day intervention window.[199]

---

have been living in the same home as the child and holding himself out to be the child's father. UTAH CODE § 78B-6-110(2)(g) (requiring notice to be served on "a person who is . . . openly living in the same household with the child at the time . . . and . . . [is] holding himself out to be the child's father"). J.N. does not argue that he was entitled to notice under this provision.

[197] J.N. argues that at the time the petition was filed he could not have intervened because his marriage had not yet been judicially recognized. Not only does this argument undermine J.N.'s contention that his common-law marriage was legally effective at the time the adoption proceeding commenced, but it also ignores the fact that he could have sought judicial recognition of his marriage within this case.

[198] We note that to hold otherwise would retroactively impose a burden on the Adoptive Parents as well as inject unnecessary delay and uncertainty into the adoption proceeding. This is something we seek to avoid. *See id.* § 78B-6-102(6)(c) ("A certain degree of finality is necessary in order to facilitate the state's compelling interest. The Legislature finds that the interests of the state, the mother, the child, and the adoptive parents described in this section outweigh the interest of an unmarried biological father who does not timely grasp the opportunity to establish and demonstrate a relationship with his child in accordance with the requirements of this chapter.").

[199] *See* UTAH R. CIV. P. 24(a) (granting an intervention of right only if there is a "timely application" to intervene).

52

Because J.N. failed to file a motion to intervene within this time, his motion was untimely and the district court had the discretion to deny it. Accordingly, we affirm the district court's denial of J.N.'s motion to intervene.

## Conclusion

¶114   Because section 110 of Utah's Adoption Act authorized the district court to terminate Mother's fundamental right to parent her child, we review its application to Mother under our strict scrutiny standard. And under this standard, section 110's strict compliance requirement, as applied to Mother, is not narrowly tailored to achieve the state's compelling interest in prompt adoption proceedings. Accordingly, we reverse the district court's decision to bar Mother from the adoption proceeding and remand for a new hearing in which Mother may participate. Additionally, we affirm the district court's decision to deny J.N.'s motion to intervene because his motion was untimely.

_____

JUSTICE PETERSEN, concurring in the result:

¶115   I concur in the result of the majority opinion. And I agree with much of the majority's analysis. But the dissent raises some concerns that I share, which the majority has not sufficiently answered.[200]

¶116   I agree with the majority that Mother has parental rights, which are fundamental. And as a general matter, a state infringement of a fundamental right is subject to heightened scrutiny. Further, substantive due process principles are applicable to laws of both a substantive and a procedural nature. *See, e.g.*, *In re Adoption of J.S.*, 2014 UT 51, ¶¶ 21–22, 358 P.3d 1009. So I do not find it inappropriate to apply such principles here. But I do find our application of strict scrutiny to a straightforward preservation rule to be novel. Because of this, I think we should acknowledge that we

_____

[200] I also agree with the dissent's observation that "[t]his court may well have the authority to prescribe a procedural default rule that could govern in a case like this one," *see infra* ¶ 123 n.201, pursuant to our constitutional power to "adopt rules of procedure and evidence to be used in the courts of the state," *see* UTAH CONST. art. VIII, § 4. But as the dissent notes, Mother did not raise this issue.

are applying strict scrutiny in a new context and clarify the parameters of our holding.

¶117   The majority asserts that its reasoning follows directly from established precedent. *See, e.g., supra* ¶¶ 62, 76, 78. But neither the majority nor Mother has identified any case where we or the United States Supreme Court has applied heightened scrutiny to a rule of preservation. And that is what we have here. As the dissent rightly observes, "[t]his is a rule of preservation—a law prescribing the form or timing of an objection necessary for a litigant to proceed with the assertion of her legal rights." *Infra* ¶ 122.

¶118   In my view, applying strict scrutiny to a rule of preservation for the first time is significant because, as the dissent notes, "[s]uch rules abound in our law." *Infra* ¶ 122. And they perform a critical function. At a very basic level, they set the rules for the orderly processing of civil and criminal litigation. But the majority insists we are not breaking new ground.

¶119   I think we should acknowledge that we are. First, we should recognize that we have never applied heightened scrutiny to a standard rule of preservation. And we should explain why we are extending strict scrutiny to this context.

¶120   Second, we should clarify the parameters of our holding. This decision could be read to apply to the many deadlines, filing requirements, and other rules of preservation found throughout the law, including in our own rules of procedure. Certainly, these rules at times affect litigants' fundamental rights if they fail to comply with them. Even though this case involves an as-applied challenge ostensibly confined to its facts, this does not sufficiently define the reach of our holding. The material facts here would seem to be present whenever a litigant could establish that she had a fundamental right of some kind, and it was terminated by a preservation rule with which she substantially complied but did not fully comply. As it is, the majority's holding seems open-ended. In light of the ubiquity of preservation rules and the core function they perform in our legal system, this has the potential to create confusion.

———————

ASSOCIATE CHIEF JUSTICE LEE, dissenting:

¶121   The Utah Adoption Act requires a mother who wishes to oppose the adoption of her biological child to file a motion to intervene in the adoption proceedings. *See* UTAH CODE § 78B-6-110(6). By statute, the mother must "strictly comply" with

this requirement. *Id.* § 78B-6-110(6)(b). Failure to do so within thirty days of being served with notice of the proceedings results in a "forfeit[ure]" of the mother's parental rights. *Id.* § 78B-6-110(6)(b)(ii).

¶122   This is a rule of preservation—a law prescribing the form or timing of an objection necessary for a litigant to proceed with the assertion of her legal rights. Such rules abound in our law. And the long-established consequence of the failure to follow such rules is a procedural default, with a resulting loss of the underlying right.

¶123   The majority opposes this effect of the Adoption Act. It overrides the plain text of the statute, excuses the mother from her procedural default, and adopts a new rule of preservation of its own making—a rule that allows a mother to avoid forfeiture of her rights if she files a document that "fulfill[s] the purpose[]" of a motion to intervene.[201] *Supra* ¶ 47.

¶124   I respectfully dissent from this decision. The court claims to find support for it in a body of substantive due process case law. But the court's holding does not follow from that case law. It is a bold, policy-driven override of a law enacted by the legislature. I dissent because I find no basis for today's decision in the due

---

[201] This court may well have the authority to prescribe a procedural default rule that could govern in a case like this one. *See* UTAH CONST. art. VIII, § 4 (recognizing this court's power to "adopt rules of procedure and evidence to be used in the courts of the state"); *State v. Rettig*, 2017 UT 83, ¶¶ 58, 58 n.12, 416 P.3d 520 (strongly suggesting that filing deadlines triggering procedural default or forfeiture of legal rights are "procedural" and thus within our constitutional power to establish). The Adoption Act's default rule, moreover, may be subject to constitutional challenge on the ground that it is procedural and the legislature has not properly exercised its authority to amend our rules. *See Rettig*, 2017 UT 83, ¶¶ 52, 60 (expressing "doubts" about whether a statutory rule of procedural default would withstand scrutiny under article VIII, section 4 of the Utah Constitution but declining to reach the question because it had not been raised); *Brown v. Cox*, 2017 UT 3, ¶¶ 17–18, 387 P.3d 1040 (identifying the process the legislature must follow to amend our rules). This court has not enacted any such rule, however. And the mother has not raised a constitutional claim under article VIII, section 4. For that reason this question is not properly before us.

process principles cited by the majority and foresee significant mischief caused by it.

¶125 The mother in this case failed to follow the statutory filing requirement. She did so not because of any difficulty in following the requirement, but because she got bad advice from her lawyer. The requirement, moreover, is admittedly fair and entirely constitutional as a matter of procedural due process. The majority agrees. *See supra* ¶ 29 (citing *In re Adoption of J.S.*, 2014 UT 51, ¶ 23, 358 P.3d 1009 for the proposition that "when the failure to comply with a 'simple and straightforward' procedural requirement is due to legal counsel's mistake, the procedural requirement has not foreclosed meaningful access to the justice system").[202] Yet the court proceeds to establish a new constitutional right of due process that excuses the mother's procedural default. It holds that "mothers retain a fundamental right in their children regardless of a failure to comply with any state-prescribed procedure."[203] *Supra* ¶ 37.

¶126 The majority seeks to portray its decision as a matter that follows from settled precedent. But that is incorrect. No court, to

---

[202] The court's procedural due process holding, in fact, follows from established principles of forfeiture. Most legal rights are subject to forfeiture by procedural default. *See Yakus v. United States*, 321 U.S. 414, 444 (1944) (noting that "constitutional right[s] may be forfeited in criminal as well as civil cases by the failure to make timely assertion of the right"); *see also Rettig*, 2017 UT 83, ¶¶ 15, 17 (noting that "procedural bar[s]" such as rules "requir[ing] parties to raise issues or arguments at specified times and by certain means" on penalty of losing the right to do so are "commonplace" and "embedded in our case law" (citations omitted)). The due process right to be heard is no exception. If a party fails to avail herself of an established means of asserting a legal right, then that right is forfeited. Such a party is in no position to complain of the lack of a constitutionally guaranteed "opportunity to be heard" as that opportunity was lost not as a result of state action but by an act of the party's agent (her counsel).

[203] The mother asserts both federal and state grounds for a new right of substantive due process, *supra* ¶ 14 n.6, but the majority never draws any distinction between the two grounds in its opinion, and it relies exclusively on precedent pertaining to federal

(Continued)

my knowledge, has ever established a constitutional right of a litigant (even one seeking to protect a fundamental right) to flout a legal filing requirement but avoid the normal consequence of such a move (procedural default). Certainly the majority has not cited such a case. And with that in mind, the court should take ownership of the novelty of its decision. It is the court's prerogative to establish new rights in the name of the constitution—the principle of substantive due process opens the door to such decisions. But in so doing the court cannot properly be viewed as merely endorsing a mechanical application of existing precedent. That is not what is going on here. The court is certainly citing a line of precedent. But its decision involves a significant extension of the cited cases. And the extension will sow the seeds of confusion in our law for years to come.

¶127   The court cites a string of cases (several from the United States Supreme Court and a few from this court) in which a parent's fundamental right is framed on the basis of "(1) the status of the individual invoking the right and (2) the parental conduct to be protected." *Supra* ¶ 59. Because the cited cases have "looked to the status of the individual and the conduct to be protected before determining whether the individual's claim fell within the umbrella of parental rights" (which are admittedly fundamental), the court objects to my more specific framing of the inquiry into the asserted "right" in question. *Supra* ¶ 60. On that basis the majority seeks to turn my criticism of the novelty of its approach against me. It asserts that I am the one who is pressing a novel framing of the inquiry into fundamental parental rights. The court's argument proceeds in two steps. First, the court complains that its cited cases ask only "whether *parental* conduct falls within the umbrella of protected parental rights," not "whether parents have a recognized right to be free of . . . a judicially imposed forfeiture of all parental rights." *Supra* ¶ 63. And because a mother's parental rights need not be "perfected" in the manner required of unwed fathers, the majority next insists that the mother's fundamental right "is not

---

due process. So I presume that it is establishing a new right of federal due process.

contingent upon compliance with any procedural requirement that the state may establish." *Supra* ¶ 83.

¶128   Each of these points begins with a correct premise. But the court's starting premises do not support its broad, sweeping conclusions.

¶129   On the first point, I can stipulate to a focus on "the status of the individual and the conduct to be protected" in deciding whether to endorse a new right of substantive due process. *Supra* ¶ 60. But that framing begs the question of what conduct, and at what level of generality to assess it. A broad framing would ask whether parental rights generally are subject to substantive due process protection. Yet that is not the only way to frame things. We could also look to the precise form of parental conduct at issue. And although the United States Supreme Court has not always been consistent on the appropriate framing, our recent precedent suggests a narrow framing that looks at the precise form of the relevant conduct.[204]

¶130   The United States Supreme Court has sometimes framed the inquiry into the existence of a new substantive due process right *at the highest level of generality*. When that court established new substantive due process rights to access contraception and abortion, for example, it framed the inquiry in broad, sweeping terms—whether there was an established tradition of respect for private decisions within a "zone of privacy."[205] But the Court's case law has not been consistent. In other cases the court has called for a much narrower framing of the inquiry into the existence of a new substantive right. In rejecting a claim to a new right to physician-assisted suicide, for example, the court narrowly framed

---

[204] The majority's "status" framing also runs into a line of United States Supreme Court precedent that cuts against its framework. In referring to "status," the majority is noting that parental rights are fundamental. *See supra* ¶¶ 60, 79. But the fundamental nature of a given right does not dictate the application of strict scrutiny to all regulations of that right. This is apparent from an important line of voting rights cases, which expressly reject the idea that all regulations of voting rights trigger strict scrutiny. *See infra* ¶¶ 159–61 (citing *Burdick v. Takushi*, 504 U.S. 428 (1992) and *Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181 (2008)).

[205] *See Roe v. Wade*, 410 U.S. 113, 152–53 (1973); *Griswold v. Connecticut*, 381 U.S. 479, 484–85 (1965).

the inquiry in terms of a "right to commit suicide" instead of the proposed broader framing of a "right to die."[206] This is a key, unresolved problem in the high court's substantive due process precedent, and a question that has attracted the attention of a range of commentators.[207]

¶131   A plurality of this court acknowledged this problem in our recent decision in *In re Adoption of J.S.*, 2014 UT 51, 358 P.3d 1009. And it endorsed a requirement of narrowly framing any new, alleged right of substantive due process. To avoid the prospect of a court making new policy in the guise of constitutional law-making, the lead opinion in *J.S.* (which was joined by Chief Justice Durrant)

---

[206] *Washington v. Glucksberg*, 521 U.S 702, 722–23 (1997); *see also id.* (rejecting other broad framings of the right at issue, including the right to "choose how to die," the right to "control of one's final days," the right to "choose a humane, dignified death," and the right to "shape death").

[207] *See*, *e.g.*, Rick Kozell, Note, *Striking the Proper Balance: Articulating the Role of Morality in the Legislative and Judicial Processes*, 47 AM. CRIM. L. REV. 1555, 1573 (2011) (explaining that "the Court has failed to articulate a method for determining the proper level of generality at which a substantive due process inquiry should be performed" despite the fact that "the level of generality with which the Court defines the conduct in question . . . often affects whether the Court finds that that conduct is entitled to protection based on history and tradition"); John F. Basiak, Jr., *Inconsistent Levels of Generality in the Characterization of Unenumerated Fundamental Rights*, 16 U. FLA. J.L. & PUB. POL'Y 401, 403 (2005) (pointing out that "when asked to recognize a fundamental right under the Due Process Clause of the Fourteenth Amendment, the U.S. Supreme Court has failed to articulate a substantial justification for the level of generality in characterizing the legal issue" (citations omitted)); David Crump, *How do the Courts Really Discover Unenumerated Fundamental Rights? Cataloguing the Methods of Judicial Alchemy*, 19 HARV. J.L. & PUB. POL'Y 795, 863–71 (1996) (describing the dilemma as "[d]etermining the reach of fundamental rights by defining the degree of abstraction" for "characterizing the relevant tradition"); Laurence H. Tribe & Michael C. Dorf, *Levels of Generality in the Definition of Rights*, 57 U. CHI. L. REV. 1057, 1058 (1990) (rejecting a methodology that requires narrow framing of substantive due process rights while acknowledging that "[t]he selection of a level of generality necessarily involves value choices").

endorsed a requirement that a party make "a *specific showing* that the *precise interest* asserted by the parent is one that is deeply rooted in this Nation's history and tradition and in the history and culture of Western civilization." *Id.* ¶ 57 (plurality opinion) (emphases added) (citation and internal quotation marks omitted). The "specific showing" of a "precise interest" suggested by *J.S.* is what I would require here—a showing not just of a well-rooted tradition of respect for parental rights generally, but of a tradition endorsing the right to retain parental rights without following procedural requirements set forth by law. The court's contrary approach not only cuts against the lead opinion in *J.S*; it also picks sides in a key point of debate in the law of substantive due process.

¶132   The majority's second point is similarly problematic. The notion that a mother's rights need not be "perfected" in the manner required of unwed fathers is only half right. And the half-wrong part underscores the degree to which the majority is making new law while claiming only to be applying established precedent.

¶133   It is of course true that a mother need not make a threshold showing of her parentage to establish her fundamental parental rights in the first instance. A mother's parental rights are perfected at the outset without any need for her to file a paternity petition or present evidence establishing the degree to which she supported or was willing to support her child. *See Id.* ¶ 2 (majority opinion). To that extent the majority is right to say that a mother's fundamental rights are not contingent on compliance with the "procedural requirement[s]" imposed by our law on fathers. *Supra* ¶ 83. But that is not the question presented here. The question here is whether a right that is admittedly perfected without the need for procedural compliance at one stage can ever be forfeited due to a procedural default at a later stage. The majority upholds that right as a matter of substantive due process. And in so doing it breaks significant new ground. No court has ever recognized this sort of right.[208]

¶134   It is true that I have cited no cases in which a biological mother forfeited her parental rights through procedural default,

---

[208] The majority tries to avoid this characterization by describing the right at issue as the mother's "'retained' fundamental right." *Supra* ¶ 56. But asserting that a fundamental right is "retained" merely begs the question: retained as of when and by what acts? The mere possession of a fundamental right does not forever

(Continued)

and a court upheld such default against a substantive due process challenge. *See supra* ¶ 79 (criticizing me for citing only cases involving putative fathers). But this is just a reflection of the fact that there are no reported cases that are directly on point—no case in which a mother forfeited her rights through procedural default, but a court excused that failure (and obviated her forfeiture) on the basis of a substantive due process right.

¶135 Our decision in *J.S.* is the most obviously relevant precedent. In that case an unmarried biological father lost his parental rights as a result of a procedural default—failure to perfect his rights by jumping through the procedural hoops required by our law (principally, the filing of an affidavit of support of his child). 2014 UT 51, ¶ 1. And we upheld those procedures against a substantive due process challenge. *Id.* ¶¶ 5–6. In so doing, as noted above, we required more than a showing of a tradition of respect for the parental rights of fathers generally—for their "status" and "conduct" at that level of generality. Instead we required the defaulting parent to demonstrate that the right to retain parental rights despite failing to comply with required procedure is "deeply rooted" in "history and tradition." *Id.* ¶ 54 (plurality opinion). This is also the showing we should require here.

¶136 The procedure at issue in *J.S.* was admittedly not the sort of procedure that would be required of a mother for the preservation of her rights. The majority seizes on this point, noting that "mothers have a 'retained' fundamental right in their children, whereas unmarried fathers have only provisional rights that must be perfected through compliance with procedure." *Supra* ¶ 79. But again, this is a partial truism. All parties to litigation are bound by

---

insulate the mother from ever losing that right. It simply means that she retains it prior to the initiation of any legal proceedings. The majority concedes the general point—acknowledging that a fundamental right may be lost through procedural default. *See supra* ¶ 98 (acknowledging that "'fundamental' rights may be extinguished through the operation of procedural provisions . . . where those provisions survive strict scrutiny review"). It just obviates the forfeiture here through the doctrine of substantive due process. *Supra* ¶ 98. The court is holding that a mother has a fundamental right to retain her parental rights despite her procedural default because the underlying parental right itself is fundamental. But that is circular. And it is a novel, sweeping extension of existing case law.

some procedure. And until today, no court had ever held that a fundamental parental right, once perfected, is subject only to those rules of procedure that can survive strict scrutiny review. The majority leans heavily on the "fundamental" nature of such rights to justify this result. But nowhere in the case law does the fact that a right is "fundamental" entitle its holder to forgo compliance with any procedure except that which withstands strict scrutiny. That conclusion certainly does not follow from the premise that the procedures necessary for a father's perfection of his parental rights at the outset do not apply to mothers in the first instance.[209]

¶137    A mother is not required to jump through procedural hoops to establish her parental rights in the first instance. But that is not because mothers are categorically exempt from the law of procedure. It is because they are not subject to a specific species of procedure—paternity filing requirements imposed on putative fathers before their rights can be perfected. *See* UTAH CODE § 78B-6-121(3) (in contrast to biological mothers, the "consent of an unmarried biological father [to an adoption] is not required unless . . . the unmarried biological father . . . initiates proceedings . . . to establish paternity" and complies with other procedures). For that reason, the majority's argument proves too much. Mothers are admittedly subject to some procedure. Rules of preservation in particular have always applied to all litigants. We cannot excuse a mother's compliance with the law of preservation just because mothers are exempt from compliance with other procedures.

¶138    None of the majority's cited cases is a case like this one— in which a parent's rights were terminated as a result of the parent's procedural default. The court's cited cases stand for a threshold proposition that is not in dispute in this case. They say only that a person's parental rights may not be terminated by operation of a law that cuts off the right to be heard and substitutes instead a

---

[209] It is true to a point that "the case law clearly establishes that mothers have a 'retained' fundamental right in their children." *Supra* ¶ 79. But the key question is "retained" as of when, and in what procedural context? No prior court has ever established a mother's right to retain her parental rights despite the kind of procedural default that would normally result in a forfeiture. So in that sense this case presents a question of first impression. I think the answer follows clearly from the framing of the inquiry in *J.S.* The majority concludes otherwise. But it cannot properly be heard to insist that its decision follows from established case law.

conclusive presumption of unfitness. That is the holding of *Quilloin v. Walcott*, 434 U.S. 246 (1978), *Stanley v. Illinois*, 405 U.S. 645 (1972), and *In re J.P.*, 648 P.2d 1364 (Utah 1982). And that proposition has no purchase here. In this case the law did not authorize the termination of parental rights without an opportunity for a parent to be heard. It expressly provided for such an opportunity—and imposed a natural consequence (forfeiture by default) for the failure to comply with the required procedure. The question here, then, is whether a mother who lost her parental rights by forfeiture through procedural default may excuse that default by claiming a substantive due process right to ignore existing procedure (unless the procedure withstands strict scrutiny). And there is no support in any precedent for the establishment of such a right.

¶139 The court's holding, in fact, runs directly counter to another line of precedent that the majority ignores. Voting rights are undoubtedly "fundamental" under a long line of United States Supreme Court authority. *See Ill. State Bd. of Elections v. Socialist Workers Party*, 440 U.S. 173, 184 (1979); *Dunn v. Blumstein*, 405 U.S. 330, 336 (1972); *Williams v. Rhodes*, 393 U.S. 23, 38 (1968); *Yick Wo v. Hopkins*, 118 U.S. 356, 370 (1886). But the United States Supreme Court has gone out of its way to emphasize that the fundamental nature of this right does not subject all procedural regulation of the right to strict scrutiny. *See Burdick v. Takushi*, 504 U.S. 428, 432–33 (1992); *Munro v. Socialist Workers Party*, 479 U.S. 189, 193 (1986). In the voting rights realm, a neutral, nondiscriminatory regulation like a procedural default rule would not trigger strict scrutiny. *Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181, 203–04 (2008). It would trigger a deferential standard of scrutiny that would uphold the constitutionality of our neutral rules of procedural default. The same holds for regulation of other fundamental rights like the rights to privacy, free speech, and free exercise of religion. *See infra* ¶ 159 (discussing privacy, speech, and religion cases). And the majority's holding today is incompatible with all of these cases. *See infra* ¶¶ 160–65 (discussing the voting rights cases).

¶140 The majority's basis for a substantive due process right to avoid the usual effect (forfeiture) of a procedural default is thus as novel as it is sweeping. The court's holding, moreover, will introduce substantial confusion and uncertainty going forward. If the majority opinion takes root, the whole idea of procedural regulation by a uniform set of rules will be placed in jeopardy. If our law requires case-by-case scrutiny of whether our procedural rules are the "least restrictive means" of advancing "compelling governmental interests," most any procedural default rule may be

set aside as unconstitutional. Most procedural rules, after all, are in a sense arbitrary. That means that there will almost always be a less restrictive means of advancing the underlying goal. And that will open the door for our courts to second-guess a broad range of rules of procedural default whenever our judges think that the purpose of a governing rule could be advanced in a less restrictive way. This is problematic.

¶141   I respectfully dissent for reasons explained in greater detail below. In Part I, I address the strict scrutiny argument—analyzing the cases cited in the mother's brief and applied by the majority, outlining the standard applied to regulation of the fundamental right to vote, and emphasizing the novel extension of the law endorsed by the majority opinion. Then in Part II, I identify the confusion and upheaval that the majority's framework will introduce into our law.

I

¶142   The mother seeks to avoid the effects of forfeiture by asserting a substantive due process right. Yet she has failed to cite any precedent sustaining a substantive due process right to avoid the natural consequence (forfeiture) of a procedural default. And the majority opinion is similarly deficient.

¶143   The fulcrum of the majority opinion is the notion that the mother has "fundamental rights" as a parent. The mother's brief is premised on the same notion. Citing *In re J.P.*, 648 P.2d 1364 (Utah 1982) and *Quilloin v. Walcott*, 434 U.S. 246 (1978), the mother asserts that the governing precedent "condemn[s] the termination of a mother's parental rights over her objection and without a finding of unfitness." And the majority correctly notes that the mother's parental rights include the right to object to an adoption. *Supra* ¶ 37.

¶144   This is all correct as far as it goes. But the fundamental right recognized in the cited case law has no currency here. The mother's rights were not terminated "over her objection." She just failed to object under the procedures set forth in our law. The mother's right to object to an adoption is not a right to object in any manner she chooses. It is a right to object in accordance with prescribed procedure. And the natural consequence of the failure to comply with that procedure is a default—forfeiture of her rights.

¶145 As the majority notes, our case law identifies a substantive due process basis for a party to establish an exception to this normal consequence—by providing proof of a "deeply rooted" history and tradition at a very specific level of generality.

This is the standard set forth in *In re J.P.* and reinforced in *J.S.* But the mother has failed to carry her burden under these cases. She nowhere establishes a "deeply rooted" history and tradition of a right to preserve parental rights despite non-compliance with the procedure required by law. And her assertion of a substantive due process right accordingly fails.

¶146   The majority objects to this framing of the right at issue. It contends that we should focus on "the status of the individual invoking the right"[210] and "the parental conduct to be protected," *supra* ¶ 59, by asking "whether [such] *parental* conduct falls within the umbrella of protected parental rights," *supra* ¶ 63. That is fine as far as it goes. But the majority's approach—inquiring into the protected status of parental conduct—begs the question: at what level of generality should the relevant conduct be characterized in assessing whether it is protected by substantive due process? The majority rejects my narrow framing of the relevant conduct (whether there is a right to an exemption from procedural default) in favor of a much broader framing (whether there is a right to parent generally).[211] But this is a disputed question implicating a

---

[210] The majority points to *Meyer v. Nebraska*, 262 U.S. 390 (1923) in support of its view that the right at issue in today's case should be defined by "the individual's status as a parent," *supra* ¶ 59, rather than by the "form of governmental interference," *supra* ¶¶ 62–63. In light of the level of generality problem discussed herein, this distinction is inapposite. Regardless, the *Meyer* court's discussion of a parent's right to control the education of her children does not speak to the issue in this case—whether a fundamental parental right encompasses the right to be free from the normal rules of procedural default.

[211] The majority complains that my framing is wrong because I "fail[] to identify any *parental* conduct." *Supra* ¶ 65. Continuing the thought, the majority says that the proper framing must consider conduct "directed at the parent's child"—the "parents' interactions with their children and . . . whether the parent had a fundamental right to so interact"—"not conduct directed at, or from, the State." *Supra* ¶ 66. To support this view, the court cites a United States Supreme Court case, *Wisconsin v. Yoder*, 406 U.S. 205, 232 (1972), that maintains the focus on this form of parental conduct. *See supra* ¶¶ 66–68.

(Continued)

serious and extensive debate in constitutional law. The level of generality at which an asserted right is framed can be outcome-determinative—the narrower the framing, the harder it will be to establish that the right is "deeply rooted" in history and tradition.

¶147   The level of generality problem is on display in some of the United States Supreme Court's most prominent substantive due process decisions. Some of that court's most fractured, controversial decisions have implicated this problem. Yet the high court has never conclusively established a governing standard. The justices openly debated the question of the appropriate level of

---

But *Yoder* is unhelpful. And the court's premises are nothing more than a restatement of its ultimate holding—certainly not a reflection of any established law. The majority's framing conflates the parental conduct that is being terminated ("the entire bundle of parental rights" and "conduct inherent in the parent-child relationship," *supra* ¶ 73) with the conduct triggering that termination. Forfeiture of parental rights is triggered by procedural default on the part of the parent. And the acts leading to a procedural default are the relevant "parental conduct" in a case like this one.

This case presents a question of first impression. And it is hardly surprising that in the very different context of deciding whether a parent has parental rights in the first place, courts have not focused on "conduct directed at, or from, the State." *Supra* ¶ 66. That said, no court has ever held that we may not consider a parent's conduct "directed at, or from, the State" in deciding whether there is a substantive due process right that forecloses the effects of a procedural bar. What other conduct would we consider in deciding the constitutionality of a procedural bar? And if a *parent* defaults her *parental* rights, how can that be anything other than "parental conduct"?

In some settings, it is certainly true that the inquiry into a parent's fundamental rights is based on parental conduct "directed at" the child, and not "at, or from, the State." But there is no universal rule to this effect. And the majority's framing cannot hold in the context of forfeiture by procedural default unless we mean to foreclose the possibility of such forfeiture altogether—which of course is the key question presented in this case. The court's decision accomplishes that task. But it finds no support in any relevant authority in so doing.

generality in *Michael H. v. Gerald D.*, 491 U.S. 110, 127 n.6 (1989) (plurality opinion) (arguing for a framing at "the most specific level at which a relevant tradition protecting, or denying protection to, the asserted right can be identified"); *id.* at 139 (Brennan, J., dissenting) (asserting that the inquiry should be framed broadly: "whether parenthood is an interest that historically has received our attention and protection"); *id.* at 132 (O'Connor, J., concurring in part) (criticizing the plurality's methodology as "inconsistent with our past decisions in this area" which sometimes "characterize[] [the] relevant traditions protecting asserted rights at levels of generality that might not be the most specific level available" (citations and internal quotation marks omitted)). But there was no majority view on the matter. And elsewhere the Court has been consistently inconsistent—sometimes framing the inquiry at a high level of generality, and sometimes opting for a much narrower framing of the proposed right at issue. *See supra* ¶ 130.

¶148 Commentators have highlighted both the inconsistency in the United States Supreme Court's substantive due process framework and also its significance. In the words of one commentator, "the determination of whether history and tradition entitle a particular type of conduct to protection *depends upon the breadth with which the Court defines the conduct in question*." Rick Kozell, Note, *Striking the Proper Balance: Articulating the Role of Morality in the Legislative and Judicial Processes*, 47 AM. CRIM. L. REV. 1555, 1572 (2011) (emphasis added). Another observes that "[t]he manner in which the court characterizes the issue critically defines the scope and boundaries of its reasoning and *significantly impacts its holding*," and emphasizes that the high court "fails to provide jurisprudence that is consistent enough to guide lower federal courts." John F. Basiak, Jr., *Inconsistent Levels of Generality in the Characterization of Unenumerated Fundamental Rights*, 16 U. FLA. J.L. & PUB. POL'Y 401, 403, 405 (2005) (emphasis added). Professors Tribe and Dorf, for their part, acknowledge that "[t]he selection of a level of generality necessarily involves value choices," but argue in favor of a broad framing of the inquiry. *See* Laurence H. Tribe & Michael C. Dorf, *Levels of Generality in the Definition of Rights*, 57 U. CHI. L. REV. 1057, 1058 (1990).

¶149 The majority acknowledges the general point, but claims that the level of generality at which to frame the mother's asserted substantive due process right "is not an issue in this case." *Supra* ¶ 73. It argues that "[t]he level of generality at which an asserted right is framed may properly be considered an unresolved issue only where a party argues that the Due Process Clause protects

someone whose (1) status or (2) conduct had not previously received constitutional protection." *Supra* ¶ 70. That is fine as far as it goes—I agree that once controlling precedent has established the relevant level of generality there is no reason to rehash the question. And I agree that the level of generality at which to frame the mother's asserted substantive due process right in this case is not an unresolved issue. But I think that our Utah case law, in *J.S.*, prescribes a narrow framing for an alleged new substantive right, while the majority argues that our case law calls for a broad framing. *Supra* ¶ 73.

¶150 In arguing for a broad framing, the majority leans heavily on the idea that in cases addressing termination of parental rights, "courts should define the parental right broadly to encompass the full spectrum of constitutionally protected parental conduct inherent in the parent-child relationship" because "the 'parental conduct' at issue in a parental rights termination case encompasses the entire bundle of parental rights." *Supra* ¶ 73. Again, however, the majority seems to conflate the parental conduct that is terminated (encompassing the "full spectrum of constitutionally protected parental conduct") with the conduct triggering that termination. *See supra* ¶ 146 n.211. And for the same reason the various propositions it attributes to its cited cases miss the mark. *See supra* ¶¶ 74–77 (for example emphasizing that *In re J.P.* "involve[d] a permanent termination *of all parental rights*" (alteration in original)).

¶151 Our recent decision in *J.S.*, however, speaks directly to the level of generality question. And unlike United States Supreme Court case law, our Utah case law not only acknowledges the problem but suggests an answer. The lead opinion in *J.S.* called for a narrow framing of any alleged, new substantive right—a framing that considers the precise form of the relevant conduct in assessing whether there is a sufficient history and tradition of protecting such conduct to justify the establishment of a new constitutional right. The requirement it put forth, specifically, is of "a *specific showing* that the *precise interest* asserted by the parent is one that is deeply rooted in this Nation's history and tradition and in the history and culture of Western civilization." *In re Adoption of J.S.*, 2014 UT 51, ¶ 57 (plurality opinion) (emphases added) (citations and internal quotation marks omitted)). In explaining this requirement the *J.S.* opinion emphasized that the showing helps ensure that the power to establish new substantive due process rights is not transformed into a vehicle for judicial policy-making. *See id.* ¶ 61 (noting that "due process innovations" absent "any effective limiting principle"

will put courts in the "problematic realm" of making "policy judgments[, which] are matters for legislative action" (plurality opinion) (internal quotation marks omitted)).

¶152   We should apply this standard here. We should require a "specific showing of a precise interest" before establishing a new right of substantive due process. That showing requires more than just a tradition of respecting parental rights generally. To establish this new right the mother must establish a tradition of protecting parental rights despite a procedural default. This is the framework suggested by *J.S.* And the majority does not present a satisfactory reason for departing from it on this high-stakes point of debate in the jurisprudence of substantive due process.[212]

¶153   In framing the right at issue broadly (and inconsistently with *J.S.*), the majority paints a picture of a disposition that follows naturally from settled precedent upholding the fundamental nature of parental rights generally. But framed properly, the specific right established by the majority can be seen for what it is — a novel holding in a case of first impression. No court has ever established a substantive due process right to override a forfeiture of parental rights resulting from a procedural default. This court has held, at most, that a mother has a fundamental right "not to be deprived of parental rights without a showing of unfitness, abandonment, or substantial neglect." *In re J.P.*, 648 P.2d at 1375; *see also Wells v. Children's Aid Soc. of Utah*, 681 P.2d 199, 203 (Utah 1984). United States Supreme Court precedent is to the same effect. In *Quilloin v. Walcott*, the Court concluded that it would violate a right of substantive due process for the state "to force the breakup of a natural family, over the objections of the parents and their children, without some showing of unfitness and for the sole reason that to do so was thought to be in the children's best interest." 434 U.S. at

---

[212] In a related critique, the majority chides me for denying the right at issue "the heightened protection our case law would *typically* provide [it]." *Supra* ¶ 57 (emphasis added). But this point suffers from the same misstep. The court is again characterizing the purported fundamental right at the highest level of generality, presuming that the right at issue encompasses the right to avoid procedural default—that such protection is "typical." This is incorrect. The majority extends this protection in this *case of first impression*—and a protection cannot be "typical" if it has not been extended before.

255. This same premise is inherent in the Court's analysis in *Stanley v. Illinois*, 405 U.S. 645 (1972).

¶154　This precedent tells us that strict scrutiny is triggered by a statute that authorizes the termination of a mother's parental rights over her properly asserted objection and without a requirement of proof of unfitness, abandonment, or neglect. But the Adoption Act did not authorize such termination.[213] And strict

---

[213] The Adoption Act did not authorize the district court to terminate a mother's parental rights without requiring "proof of unfitness, abandonment, or neglect." It required proof on those points as a prerequisite to parental termination, and afforded the mother an avenue to advance her views on these questions. UTAH CODE § 78B-6-110(6)(a). The statute admittedly does allow for termination without a finding of unfitness, etc. in the event of a default by the mother—failure to comply with the statutory procedures for her appearance as a party. UTAH CODE § 78B-6-112(5)(c) (2015). But that doesn't mean that the statute exempts mothers from the requirement of proof of grounds for termination. It just means that the statute prescribes specific procedures for a mother to assert her position in court. And it shows that the Adoption Act is in line with our longstanding law of forfeiture or procedural default—which provides that most any party may lose her rights by the failure to assert them in the manner and at the time required by law. The mother did not lose her parental rights, in other words, as a result of a statute that eliminated a requirement of proof of grounds for termination for a class of parents. She lost her rights as a result of her failure to avail herself of procedures afforded by law for her to assert her position on such grounds.

The majority claims that this position "ignore[s] the 'as-applied nature of Mother's substantive due process claim"—presumably because in *this* case the mother's parental rights were terminated without proof of unfitness, abandonment, or neglect. *Supra* ¶ 38 n.68. But that will always be the case when parental rights are terminated by a parent's procedural default. The majority also insists that a mother "maintain[s] her parental rights unless she voluntarily relinquishes them or a court finds that she forfeited them by being an unfit parent or by abandoning or neglecting the child." *Supra* ¶ 38 n.68. This is true as far as it goes. But the majority errs in its failure to read this requirement against the longstanding background principle of procedural default. *See Yakus v. United*

(Continued)

scrutiny review is accordingly not triggered under the above cases.[214]

---

*States*, 321 U.S. 414, 444 (1944) (noting that "constitutional right[s] may be forfeited . . . by the failure to make timely assertion of the right"); *see also Rettig*, 2017 UT 83, ¶¶ 15, 17 (explaining that "procedural bar[s]" such as rules "requir[ing] parties to raise issues or arguments at specified times and by certain means" on penalty of losing the right to do so are "commonplace" and "embedded in our caselaw"(citations omitted).

[214] In so concluding I have not "avoid[ed] the central question presented by Mother's substantive due process claim." *Supra* ¶ 96. I have simply applied the applicable substantive due process standard from *J.S.* and concluded that the mother has failed to carry her burden under that standard. The majority thus misstates my position. I am not saying that "'procedures' may never be subject to 'substantive due process scrutiny'," *supra* ¶ 43 n.85, that "a party can be barred from challenging an unconstitutional procedural requirement due to that party's failure to comply with that unconstitutional requirement," *supra* ¶ 94 n.173, or that the mother in this case is "precluded from challenging the fairness of procedural bars on substantive due process grounds," *supra* ¶ 98 n.175. The mother has every right to mount such a substantive due process challenge. I am only insisting that she do so in compliance with the test put forth in *J.S.*—a test that frames the issue narrowly by requiring "a specific showing" of a "precise interest" that is "deeply rooted" in history and tradition. *In re J.S.*, 2014 UT 51, ¶ 57 (plurality opinion).

And it is because the mother failed to make the showing required by our precedent that I would decline to strike down the challenged procedural requirement on substantive due process grounds. I have not "assume[d], without analysis, that the procedural requirement that triggered Mother's default was constitutional." *Supra* ¶ 96. Nor have I "argue[d] that the procedural requirement that authorized the State to terminate Mother's fundamental parental rights [wa]s constitutional because Mother failed to comply with that procedure." *Supra* ¶ 97. I agree with the majority that such an approach would be circular. But it is not the approach that I have taken. And the majority has cited no part of my opinion to support its contention that I claim that the Act's strict compliance provision is constitutional *because* the mother defaulted under it.

¶155    The key factual premise of the majority opinion is the notion that the district court "terminate[d] Mother's parental rights without her consent and without proof of parental unfitness, abandonment, or neglect." *See supra* ¶ 38. That is true as far as it goes. But that premise alone does not support the majority's conclusion that section 110 of the Adoption Act is subject to strict scrutiny. *See supra* ¶ 37. The majority opinion overlooks the crucial facts that the statute (a) retains the mother's right to insist on proof of unfitness, abandonment, or neglect as a precondition to the termination of her rights, and (b) outlines clear steps for the mother to take in order to preserve her right to assert her views on these matters before her rights were terminated (steps the majority concedes comply with the demands of procedural due process, *see supra* ¶¶ 22–30). The statute also prescribes clear consequences for the failure to follow the stated procedures. These include termination—not on the ground that the mother was unfit—but on the ground that she procedurally defaulted. The statute, in other words, did not take away the mother's right to insist that the court make a finding of unfitness before terminating her rights; the mother just forfeited that right by defaulting under the statute—by not filing the required motion to intervene.

¶156    That leaves the question whether the mother may excuse her forfeiture by claiming a substantive due process right to ignore the procedural requirements of the Adoption Act. The majority concludes that the mother has that right. It says that "mothers retain a fundamental right in their children *regardless of a failure to comply with any state-prescribed procedure.*" *Supra* ¶ 37 (emphasis added). The court cites no authority for that proposition. But the premise of its holding is the notion that a mother's parental rights are fundamental and that procedural compliance is not necessary to preserve their fundamental nature. *Supra* ¶ 88. In describing its holding, the court says that substantive due process "protects individuals from being deprived of fundamental rights through the operation of procedures that are not narrowly tailored to further compelling state interests." *Supra* ¶ 98.

¶157    This is the essence of the court's holding. Because I oppose it, the court accuses me of creating a "novel framework" under which a fundamental right "can lose the protection of strict scrutiny review where the holder of the right fails to take on-going steps to preserve it." *Supra* ¶ 88. But the "novel framework" the majority accuses me of establishing is nothing more than the longstanding law of procedural default. And the fundamental

nature of a parental right is in no way undermined by the determination that it is subject to such law.[215]

¶158    The case law in this field also does not sustain the majority's holding. An important line of precedent from the United States Supreme Court establishes that states retain the power to regulate even "fundamental" rights through procedure—and clearly rejects the notion that all such regulation is subject to strict scrutiny. The parental rights cases cited by the majority are not to the contrary. None of those cases comes close to establishing the substantive due process right established by the court today. The governing standard should be the one set forth in our opinion in *J.S.*, and the mother has not come close to satisfying that standard.

A. Standards of Scrutiny for Regulation of Fundamental Rights

¶159    The "fundamental" nature of a given right is not alone enough to trigger strict scrutiny of any procedural regulation of that right. The United States Supreme Court has applied something less than strict scrutiny review to the infringement of many fundamental rights, including the right to privacy, the right to freedom of speech, and the right to free exercise of religion. *See generally, e.g.*, *Planned Parenthood v. Casey*, 505 U.S. 833 (1992) (discarding the strict scrutiny-based abortion trimester framework of *Roe v. Wade*, 410 U.S. 113 (1973) for a more lenient "undue burden" test); *United States v. O'Brien*, 391 U.S. 367 (1968) (applying a more deferential standard to content-neutral regulation of speech than the strict scrutiny generally triggered by content-based regulations); *Employ't Div. v. Smith*, 494 U.S. 872 (1990) (holding strict scrutiny inappropriate for neutral and generally applicable laws burdening religious practice). One commentator looking at these trends has observed that "the notion that government

---

[215] The majority also misses the mark in characterizing my position as resting on the notion that "strict compliance [i]s necessary to *preserve* the fundamental nature of [the mother's] rights." *Supra* ¶ 88. The fundamental nature of the underlying parental right stays the same throughout—my point is just that the right at issue here is distinct from that underlying right. The right at issue is the right to be exempt from forfeiture by procedural default (unless the defaulted procedure survives strict scrutiny). And it is this difference in characterization of the right at issue (based on different levels of generality) that underlies much of my disagreement with the majority. *See, e.g., supra* ¶¶ 146–52.

restrictions on fundamental rights are [always] subject to strict scrutiny review is fundamentally wrong" because "[s]ome fundamental rights trigger intermediate scrutiny," some are "protected only by reasonableness or rational basis review," and others "are governed by categorical rules, with no formal 'scrutiny' or standard of review whatsoever." Adam Winkler, *Fundamentally Wrong About Fundamental Rights*, 23 CONST. COMMENT. 227, 227–28 (2006).[216]

¶160   The fact that fundamental rights do not always trigger the protection of strict scrutiny is made especially clear in a body of voting rights cases. The right to vote is described as "fundamental" in United States Supreme Court precedent. *See Burdick v. Takushi*, 504 U.S. 428, 433 (1992). But the high court has expressly rejected the proposition that this means that any regulation of this fundamental right triggers strict scrutiny. *See id.* at 432–34. In *Burdick* the Court described the idea that "a law that imposes any burden upon the [fundamental] right . . . must be subject to strict scrutiny" as an "erroneous assumption." *Id.* at 432. It also warned that a decision "to subject every . . . regulation [of a fundamental right] to strict scrutiny and to require that the regulation be narrowly tailored to advance a compelling state interest" would impermissibly "tie the hands of States." *Id.* at 433. With this in mind, the Court has applied different levels of scrutiny to various regulations of the fundamental right to vote, depending on the degree to which the regulation restricts the right.

¶161   This framework is on display in *Crawford v. Marion County Election Board*, 553 U.S. 181 (2008), in which the Court upheld a challenge to the constitutionality of an Indiana voter identification law. The *Crawford* case failed to produce a majority opinion. But the plurality and concurring opinions set forth two frameworks for analysis that both repudiate the idea of strict scrutiny of all regulation of the fundamental right to vote. Justice Stevens' plurality opinion describes the operative regime as a

---

[216] Professor Winkler has further explained that the notion that fundamental rights always trigger strict scrutiny "remains popular because it makes a rather complex doctrinal reality quite simple and easy to memorize," but that "[s]uch simplicity[] . . . comes at considerable cost . . . breeding confusion and misunderstanding about how constitutional law works." Adam Winkler, *Fundamentally Wrong About Fundamental Rights*, 23 CONST. COMMENT. 227, 239 (2006).

"balancing approach" that weighs "the precise interests put forward by the State" against the "asserted injury to the right to vote." *Id.* at 190 (citation omitted). On the other hand, Justice Scalia's concurring opinion suggests that the Court applies a "two-track approach" that applies a "deferential 'important regulatory interests' standard for nonsevere, nondiscriminatory restrictions," and "strict scrutiny for laws that severely restrict the right to vote." *Id.* at 204-05.

¶162   Thus, the United States Supreme Court has made clear that voting rights "are not absolute and are necessarily subject to qualification" by state regulation, *Munro v. Socialist Workers Party*, 479 U.S. 189, 193 (1986), despite the fact that such rights are "of the most fundamental significance under our constitutional structure," *Illinois State Bd. of Elections v. Socialist Workers Party*, 440 U.S. 173, 184 (1979). Regulation will invariably impose some burden on an individual's fundamental rights (to vote and associate freely). But the Court has nonetheless held that "as a practical matter, there must be . . . substantial regulation . . . if some sort of order, rather than chaos, is to accompany the democratic processes [of asserting these rights]." *Storer v. Brown*, 415 U.S. 724, 730 (1974).

¶163   The same conclusion must logically hold in the realm of parental rights. Such rights have been acknowledged to be fundamental, but they are not beyond the procedural reach of the State's regulatory authority. And the mere fact that such rights are "fundamental" does not mean that any regulation of them is subject to strict scrutiny.

¶164   The procedural regulation at issue here is admittedly distinct from that at issue in the above-cited voting rights cases. Here we are dealing with longstanding rules of procedural default. But that kind of regulation, if anything, would seem to trigger a more permissive standard of scrutiny—not strict scrutiny. Under either the balancing approach of the *Crawford* plurality or the two-track approach set forth in the concurrence, there is no basis for a strict scrutiny standard. Here we are dealing with the application of neutral, longstanding rules of procedure. Because such rules impose no significant burden on parental rights and are nondiscriminatory, the *Crawford* opinions suggest the applicability of a deferential standard of scrutiny.

¶165   We have no briefing from the parties on this line of cases. And the majority opinion sidesteps them entirely. So we have no reason to render a conclusive holding on the effect of these cases on our decision. I cite them, however, because they thoroughly

undermine the majority's notion that any regulation of a fundamental right is always subject to strict scrutiny.

## B. Parental Rights Cases

¶166 None of the majority's parental rights cases is to the contrary. The *Quilloin* case specifically identifies the forfeiture question that I have highlighted here but stops far short of establishing the substantive right to override a procedural default. And prior decisions of this court actively undermine the substantive due process extension established by the majority today. Our cases require far more than the vague assertion that a mother's parental rights, broadly framed, are "fundamental." The standard set forth in *In re J.P.* and reinforced by *J.S.* requires proof of a "deeply rooted" history and tradition at a very specific level of generality—here, a right to preserve a parental right despite non-compliance with the procedure required by law. The mother has failed to carry her burden under these cases. And her assertion of a substantive due process right to avoid forfeiture by procedural default should accordingly be rejected.

### 1. *Quilloin v. Walcott*

¶167 The putative father in *Quilloin* had "never married . . . or established a home" with the mother of his child. 434 U.S. at 247. Soon after the child's birth, the mother married another man and consented to adoption of the child by her husband. *Id.* Mr. Quilloin "attempted to block the adoption and to secure visitation rights, but he did not seek custody or object to the child's continuing to live with [the mother and her husband]." *Id.* The Georgia court terminated his rights upon a finding that adoption of the child by the mother's husband "was in the 'best interests of [the] child.'" *Id.* at 251 (alteration in original). There was no determination of the putative father's unfitness. *Id.* at 252. And the putative father asserted that his substantive due process rights were infringed because the state lacked sufficient justification for terminating his parental rights. *Id.*

¶168 The *Quilloin* court ruled against Mr. Quilloin. It did so on the basis of some core differences between the substantive interest established by Mr. Quilloin and that presented by the putative father in a prior parental rights case—*Stanley v. Illinois*, 405 U.S. 645. The father in *Stanley* had lived with his children and their mother for many years. *Id.* at 646. And he had thereby established a commitment and connection by which his parental rights were deemed to be perfected. *Id.* at 652. With this in mind, the *Stanley* court struck down an Illinois statute as an infringement of the

father's substantive due process rights. *Id.* at 659. The Illinois statute established a conclusive presumption that unwed fathers were unfit as parents as a matter of law. *Id.* at 649. And the *Stanley* court held that the statute infringed Mr. Stanley's fundamental parental rights because the state did not have a sufficiently compelling interest to terminate the rights of unwed fathers by operation of a legal presumption. *Id.* at 652–53.

¶169 The *Quilloin* case was different. This was "not a case in which the unwed father at any time had, or sought, actual or legal custody of his child." 434 US at 255. And that fact was sufficient to substantially alter the balance at issue in the case—whether the state had a sufficient reason to justify terminating Mr. Quilloin's parental rights without proof of unfitness.

¶170 The Court expressed "little doubt" that it would violate a right of substantive due process for the state "to force the breakup of a natural family, over the objections of the parents and their children, without some showing of unfitness and for the sole reason that to do so was thought to be in the children's best interest." *Id.* But the Court found that Mr. Quilloin's substantive interests were outweighed by the state's in these circumstances. It thus upheld the substantive authority of the state to terminate Mr. Quilloin's parental rights as a matter of law—explaining that it could not "say that the State was required in this situation to find anything more than that the adoption, and denial of legitimation, were in the 'best interests of the child.'" *Id.*

¶171 Georgia law, as the Court noted, afforded to putative fathers a procedural mechanism for perfecting their parental rights. That mechanism was the filing of a "legitimation petition." *Id.* at 253. Such a petition would have given Mr. Quilloin the same right to veto an adoption petition that a mother (or married father) had. *See id.* at 249. If Mr. Quilloin had filed such a petition, he could have objected to the adoption of his child, precluding the termination of his parental rights except upon a finding of unfitness. *Id.* Yet he failed to do so. The Georgia court concluded that Mr. Quilloin lacked standing to challenge the adoption on that basis. And the Supreme Court ultimately reversed the judgment of the Georgia court on substantive due process grounds. But the *Quilloin* court was not holding that the father's procedural default or forfeiture could be excused on substantive due process grounds. It stopped far short of establishing a substantive due process right for a parent to retain parental rights "regardless of a failure to comply with any state-prescribed procedure." *Supra* ¶ 37.

¶172 The *Quilloin* majority begins by noting an argument made by the adoptive parents (an argument that aligns precisely with the approach I am proposing in this case)—the notion that "due process was not violated, regardless of the standard applied by the trial court, since any constitutionally protected interest appellant might have had was lost by his failure to petition for legitimation during the 11 years prior to [the] filing" of the adoption petition. 434 U.S. at 254. This is a straightforward forfeiture argument. It is the idea that the father's substantive due process argument is foreclosed because the State afforded the father a right to assert his interests and he failed to avail himself of that procedure. It says that "regardless" of the substantive standard applied for balancing the putative father's interests against the state's, the putative father loses because he stands in default or forfeiture by not having availed himself of a preservation procedure for asserting his interests.

¶173 The *Quilloin* court expressly avoided this basis for disposition. And it did so in a way that undermines the majority's assertion that the *Quilloin* line of cases sustains the substantive due process right that the court establishes today. After noting the adoptive parents' argument, the court expressed concern about resting its judgment on this basis. It concluded that it didn't need to address the forfeiture argument "since under the circumstances of th[e] case [Mr. Quilloin's] substantive rights were not violated by application of a 'best interests of the child' standard." *Id.* The Court's point was that it didn't matter whether Mr. Quilloin might lose on forfeiture grounds because his substantive argument failed in any event. *See id.* (noting "hesitat[ion]" regarding "rest[ing] [a] decision on this ground, in light of evidence in the record that appellant was not aware of the legitimation procedure until after the adoption petition was filed").

¶174 This makes clear that the *Quilloin* court was not saying that a substantive due process defect can cure a party's procedural default or forfeiture. It was saying it didn't need to address the procedural default because the substantive due process claim failed on its merits in any event. This highlights a key shortcoming of the majority opinion. It clarifies that the United States Supreme Court has never recognized a substantive due process right for a parent to preserve her parental rights despite a prior procedural default.

### 2. *In re J.P.*

¶175 The same goes for our case law. Utah Supreme Court precedent has come nowhere close to endorsing the right

established by the court today. And in fact, our cases chart a burden for establishing a substantive due process right that the mother in this case has not carried.

¶176   In *In re J.P.* we emphasized the importance of framing substantive due process rights narrowly and embedding the analysis in premises that are "deeply rooted in this Nation's history and tradition" and in the "history and culture of Western civilization." 648 P.2d at 1375 (citations omitted). We warned of the perils of "innovations" in substantive due process extensions premised on "undisciplined . . . abstract formulae." *Id.* (citations and internal quotation marks omitted). And with this concern in mind, we framed the substantive due process in precise, specific terms. We did not frame the inquiry at a high level of generality by simply stating that a parent has a vague right that is "fundamental," and proceed from that sweeping premise to our own formulation of the appropriate nature and extent of that right. Instead we recognized a narrow, specific right—the "right of a parent not to be deprived of parental rights without a showing of unfitness, abandonment, or substantial neglect." *Id.* And we based that conclusion not on our own sense of the policies supporting this sort of right, but on the fact that firmly rooted "history" and longstanding tradition of the "common law" had established such a right. *Id.*

¶177   Our framing of the analysis in *J.P.* is significant. We based our determination of a substantive due process right on longstanding history and tradition. And we framed the recognized right at a highly specific level. We came nowhere close to employing substantive due process in a manner giving a parent a substantive right to avoid a default resulting from the failure to follow procedures required by law.

¶178   The *J.P.* framework requires proof of established history and tradition at a precise level of specificity. It is not enough to assert generally that a mother's parental rights are fundamental. To succeed under *J.P.*, the mother would have to present evidence of an established history and tradition of a right of mothers "not to be deprived of parental rights despite failure to comply with procedure afforded to allow the mother to assert her interests." And the mother here has made no such showing, as I explain further below.

### 3. *In re J.S.*

¶179   The majority also claims support for its substantive due process analysis in our decision in *In re Adoption of J.S.*, 2014 UT 51.

Citing *J.S.*, the majority says that "a substantive due process claim may be brought where otherwise fair procedures are alleged to be unfair in light of the 'fundamental or important' right they foreclose." *Supra* ¶ 85 (citation omitted). Because the mother's right to parent her child is concededly fundamental, the majority says that *J.S.* establishes a basis for substantive scrutiny of the fairness of the procedures set forth in the Adoption Act—and thus a basis for concluding that the mother in this case has a right to retain her parental rights despite her failure to comply with required procedures.

¶180   *J.S.* does not support the majority's approach, however. In fact, the standard set forth in *J.S.* reiterates and extends the warnings stated in *J.P. J.S.* nowhere endorses the idea of a substantive due process right to retain parental rights despite failure to comply with required procedure. Certainly it doesn't say that such a right can be premised purely on the general notion that a mother's parental rights are "fundamental." Instead it asks for proof at a highly specific level of generality.

¶181   In *J.S.* the father asserted a "substantive right" to establish his parentage without complying with the procedural elements of the statute. 2014 UT 51, ¶ 24. The governing procedure under the Adoption Act in *J.S.* was the requirement that a putative father file a detailed affidavit to preserve his parental rights. UTAH CODE § 78B-6-121(3). And the father sought to assert a "due process challenge . . . to the '*substantive* constitutionality of the affidavit requirement at issue,' while emphasizing that that claim subsisted regardless of whether the statutory limitations in question were 'applied in a *procedurally* fair manner.'" *In re Adoption of J.S.*, 2014 UT 51, ¶ 27. Thus, the father "repeatedly characterize[d] his claim as one challenging the statutory affidavit requirement as 'substantively unconstitutional,'" or in other words as "aimed at establishing a 'fundamental,' 'substantive right' of an unwed father as a parent" without complying with the statutory affidavit requirement. *Id.* ¶ 24.

¶182   In this sense *J.S.* is directly applicable to this case. As in this case, the question in *J.S.* came down to whether there was a substantive due process right to preserve parentage without complying with the procedural requirements of the law. But the standard set forth by the *J.S.* opinion is not at all compatible with the approach taken by the majority today. *J.S.* acknowledges the possibility of a limited form of substantive scrutiny of procedure—in a case in which a party can show not only that a general right or

interest is "fundamental," but also that there is an established, longstanding tradition entitling a party to the protection of such right without compliance with procedures prescribed by the government. *See id.* ¶ 57 (plurality opinion) (explaining that a party would need to "establish a specific showing that the precise interest asserted by the parent is one that is deeply rooted in this Nation's history and tradition and in the history and culture of Western civilization" (citation and internal quotation marks omitted)). In other words, *J.S.* speaks to the appropriate level of generality at which to frame an inquiry into the existence of a substantive due process right. It suggests a specific and narrow framing—not the broad, sweeping level of generality that the majority today espouses.[217]

¶183   In articulating this standard, the *J.S.* opinion went out of its way to warn of the "slippery slope problems" associated with any decision to endorse a new substantive due process right in this field. *Id.* ¶ 59 (plurality opinion). It noted that the father asserted a broad historical basis for recognizing the rights of unwed fathers. But it concluded that that was insufficient. The putative father had failed "to identify any longstanding, widespread basis in our history and culture for recognizing a perfected right in unmarried biological fathers *arising upon their mere filing of a paternity suit (and without following other requirements set forth by law)*." *Id.* (emphasis added). And it noted that "[e]ndorsement of a substantive right in this case would inevitably lead to a series of line-drawing problems going forward, requiring courts to make policy judgments about

---

[217] The majority concedes the narrow framing in *J.S.* but attempts to cabin that framing by arguing that *J.S.* "did nothing to limit the scope of relevant parental conduct" but instead "more narrowly construed the parental status—to exclude unmarried fathers who had not perfected their parental rights—deserving full due process protection." *Supra* ¶ 77 n.145. The majority's point seems to be that a holding dealing only with "status" would not be binding when it comes to "conduct." I disagree with the court's premise and with its conclusion. First, I don't think the narrow framing in *J.S.* dealt with status as opposed to conduct. Second, even accepting the majority's premise for the sake of argument, I see no reason why the level of generality would be different for "conduct" as opposed to "status"; the majority itself posits that the nature of the right at issue is defined by *both* the conduct *and* status of the parent. *See supra* ¶¶ 59, 62, 78.

whether the biological father before the court had done enough to properly justify the recognition of his parental rights." *Id.* ¶ 60. *J.S.* explained that such "policy judgments are matters for legislative action." *Id.* ¶ 61.

¶184   *J.S.* also noted that "[o]ur legislature has spoken to th[e] question" of where to draw the line on the procedure for a putative father to preserve the assertion of his parental rights—"prescribing a series of prerequisites" to the assertion of his rights. *Id.* It rejected the putative father's attempt to "second-guess those requirements" by "establish[ing] a substantive due process right to perfect his parental rights on something less than the grounds prescribed by the legislature—by filing a paternity action but not the affidavit called for by statute." *Id.* "Doing so," the plurality explained, "would put us in the problematic realm of making 'due process innovations' dictated by 'abstract formulae' and without any effective limiting principle." *Id.* And with this in mind it held the putative father to the substantive due process standard quoted above—a standard framed at a specific level of generality.

¶185   The opinion also connected this standard to the law of procedural default or forfeiture. It noted that the putative father in that case was merely "claim[ing] that he ignored" the procedural requirements of our law "on the (bad) advice of counsel." *Id.* ¶ 63. And while acknowledging that this was "unfortunate," it emphasized that "bad legal advice is no excuse for failure to follow" procedural prerequisites to the assertion of a party's legal rights, noted that "our legal system treats attorneys as agents for their clients," and explained that we "deem clients responsible for the decisions they make on advice of counsel." *Id.*

¶186   *J.S.* thus emphasizes the narrowness of the operative notion of substantive due process. In rejecting the father's substantive due process claim in that case, the lead opinion explained that the father had failed to "make the kind of showing," *id.* ¶ 58," needed to establish such a right—proof of a "longstanding, widespread basis in our history and culture for recognizing a perfected right in unmarried biological fathers arising upon their mere filing of a paternity suit (and without following other requirements set forth by law)," *id.* ¶ 59. And it also connected this strict standard of substantive due process to the law of procedural default or forfeiture.

¶187   The above bears no resemblance to the standard applied by the majority in this case. The majority invokes *J.S.* in support of a substantive standard of scrutiny of the statutory procedure under

review—here, the requirement of a motion to intervene. *See supra* ¶¶ 84–86. And it roots its holding in the bare notion that a mother's rights in a child are "fundamental"—presupposing that the inquiry should be framed at a broad, sweeping level of generality. *See supra* ¶¶84–86. But that is not the approach taken in *J.S. J.S.* took the substantive due process claim at issue on its own terms—framing it at a highly specific level of generality. And the plurality in *J.S.* rejected that claim on the ground that the father had not established a basis in history and tradition for the notion of a substantive right—narrowly framed—to preserve parental rights *without complying with the established statutory procedure*.

¶188  *J.S.* thus charts a narrow, limited domain for a claimed substantive right to preserve parental rights despite a party's default under established procedure. And it highlights the novelty—and error—in the majority's decision to endorse a substantive right to preserve parental rights despite a procedural default under the law.[218]

### 4. *In re B.Y.*

¶189   The majority also claims support for its approach in *In re Adoption of B.Y.*, 2015 UT 67. Citing *B.Y.*, the majority says that our substantive due process analysis opens the door to scrutiny of the "fairness" of a "procedural bar or limitation" in a statute "on the ground that the right foreclosed is so fundamental or important that it is protected from extinguishment." *Supra* ¶¶ 31, 98. Because the mother's right to parent her child is concededly fundamental, the majority says that *B.Y.* establishes a basis for substantive scrutiny of the fairness of the procedures set forth in the Adoption Act—and thus a basis for concluding that the mother in this case

---

[218] *J.S.* admittedly involved the rights of a putative father. And the substantive rights of an unmarried father are concededly only inchoate—"merely provisional." *See supra* ¶¶ 84, 86. But the majority misses a key point in resting its decision on the fact that a mother's parental rights are automatically fundamental. While this is true, it leaves unanswered the question of whether and to what extent a party with rights that are concededly fundamental may ignore existing procedures for the assertion of those rights without suffering the consequence of a default. The answer to that question cannot be the bare assertion that the underlying right is fundamental. That is circular. And it overrides the strict standard set forth in the case law.

has a right to retain her parental rights despite her failure to comply with required procedures. *Supra* ¶¶ 31, 98. But the *B.Y.* opinion is consistent with *Quilloin*, *J.P.*, and *J.S*—it comes nowhere close to establishing a substantive due process right to retain parental rights despite a procedural default.

¶190 In *B.Y.* a putative father sought to challenge the Adoption Act's mandate of "strict compliance" with the procedural requirements of the statute—specifically, the requirement of filing a paternity action prior to the mother's consent or relinquishment of the child for adoption. 2015 UT 67; UTAH CODE § 78B-6-121(3) (The "consent of an unmarried biological father is not required unless, prior to the time the mother executes her consent for adoption or relinquishes the child for adoption, the unmarried biological father . . . initiates proceedings . . . to establish paternity . . . ."). Despite the failure to fulfill this procedural requirement, the father in *B.Y.* asserted that he "did enough to 'grasp' his 'opportunity . . . to develop a relationship with his offspring'" to perfect a fundamental parental right under United States Supreme Court precedent. 2015 UT 67, ¶ 42 (omission in original). And he asserted that the strict compliance requirement infringed his substantive due process rights as a parent.

¶191 We acknowledged the possibility of a substantive due process claim in this realm, but we rejected it on its merits. We noted that "[a]n unwed father's rights are merely provisional," emphasized that he "must comply with legal prerequisites established by the state" to perfect such rights, and concluded that "[f]ailure to do so leaves the father's parental rights without any substantive protection—except in the narrow circumstance in which the prerequisites established by the state are *arbitrary*." *Id.* ¶ 43. In so doing we emphasized that "[t]he Due Process Clause . . . is not a license for courts to second-guess the prerequisites established by the legislature for a putative father to perfect his parental rights." *Id.* ¶ 44. "Instead," we said that "the well-settled standard yields substantial deference to the state's chosen prerequisites." *Id.* And we explained that "[i]t does so in light of the state's important interest in 'immediate and secure adoptions for eligible newborns.'" *Id.* We held that the putative father's claim "fail[ed] under this standard." *Id.* ¶ 46.

¶192 The majority seeks to distinguish *B.Y.* and to claim support for its approach in that opinion. It says that *B.Y.* supports the application of a standard of strict scrutiny in assessing the "fairness" of the procedure set forth in the Adoption Act—the

requirement of filing a motion to intervene. *Supra* ¶¶ 31, 98. And it bases that determination on the fact that this case involves the parental rights of a mother, which are automatically "fundamental," while *B.Y.* involved the rights of a putative father, which are "merely provisional." *Supra* ¶ 35. The point is correct as far as it goes. But until today, no court has ever extended it in the manner endorsed by the majority. The majority is of course right to say that a biological mother's rights are inherently and automatically "fundamental" under the law. And the court is equally correct in its observation that the parent's alleged right in *B.Y.* was inchoate or "merely provisional." This was, moreover, a key basis for our decision in *B.Y.* The substantive due process claim in *B.Y.* was deficient because a putative father's provisional right required additional acts on the father's part before the right could be perfected as fundamental. And we had no trouble rejecting the father's substantive due process right in light of the cited premises in our case law—the need for "substantial deference" to the state's chosen procedural "prerequisites" to the establishment of a parental right, and the substantial basis for protecting "the state's important interest in 'immediate and secure adoptions for eligible newborns.'" *B.Y.*, 2015 UT 67, ¶ 44.

¶193   But the majority's analysis assumes that a fundamental right once acquired is therefore insulated against forfeiture through procedural default. The court cites no case law in support of its decision to establish a new substantive right to retain a fundamental parental right despite procedural default. And such a right does not at all follow from the fact that the underlying right is itself protected as a matter of substantive due process. Again, a mother's parental rights are automatically fundamental in the sense that she is not required to jump through the procedural hoops to perfect those rights required of fathers under our case law. *See J.S.*, 2014 UT 51, ¶ 2 (explaining requirements for fathers to file paternity petitions and present evidence regarding their support of the child to make a threshold showing of parentage and perfect their parental rights). But the connection between procedural compliance and the initial perfection of parental rights is beside the point here. Here the parental right at issue is admittedly perfected (and was so without the need for the procedural compliance required of fathers), so the question is whether that concededly perfected right can later be forfeited through procedural default. By holding that it cannot, the majority establishes a new right of substantive due process.

¶194 The majority repeatedly insists otherwise. Citing cases establishing a mother's lack of need for procedural compliance at the perfection stage, it says that the mother must likewise have no obligation to comply with another set of procedures (for preservation) at a later stage. *Supra* ¶¶ 36–37; 79–91. But this is a big step. The fact that a mother need not jump through procedural hoops to perfect her parental rights not only bears on a different stage of procedural compliance; it also has no bearing on procedural default generally.

¶195 The mother is not required to jump through procedural hoops to establish her parental rights in the first instance. But that is not because her fundamental parental rights encompass a right to flout procedural requirements generally. It is because there is an established tradition—framed in narrow, specific terms—of respecting a mother's rights without any requirement of any procedural act aimed at perfecting those rights. That tradition is reflected in the fact that the law does not extend the requirement of compliance with this procedure to mothers. *See* UTAH CODE § 78B-6-121(3).

¶196 None of these premises apply to the procedures at issue here. The procedural rules of preservation assuredly *do* apply to both mothers and fathers. And in the absence of evidence of an established tradition allowing a mother to retain her rights despite a failure to comply with those rules, the court has no basis to establish the existence of such a right.

¶197 By focusing on the difference between mothers' and fathers' rights at the threshold stage of perfection and importing that distinction to any later instance of procedural default, the majority also ignores the fact that the state's interest in procedural compliance at these later stages is the same for both mothers and fathers. The fact that the mother's rights are automatically fundamental does not mean that she can blithely avoid any need to follow state procedure in an adoption proceeding.

¶198 The Adoption Act's procedural requirements are not aimed only at putative fathers. They are also aimed at mothers. *See* UTAH CODE § 78B-6-110(6)(a) (requiring that a mother, or any other party who receives notice of adoption, must file motion to intervene in adoption proceeding within 30 days); *id.* § 78B-6-110(6)(b) (stating that a mother who fails to "fully and strictly comply" with this requirement "forfeits all rights in relation to the adoptee"). And the legislature has articulated substantial interests that are advanced by requiring a mother to intervene as a

party and assert her position regarding any claimed basis for termination of her rights (such as unfitness, abandonment, or neglect). The legislature has expressly found, for example, that "the state has a compelling interest in providing stable and permanent homes for adoptive children in a prompt manner, in preventing the disruption of adoptive placements, and in holding parents accountable for meeting the needs of children." *Id.* § 78B-6-102(5)(a). It has also concluded that "adoptive children have a right to permanence and stability in adoptive placements." *Id.* § 78B-6-102(5)(c). These are important concerns. And they are obviously furthered by a requirement that a mother intervene as a party in a timely fashion and assert any proffered challenge to termination of her parental rights. Failure to do so results in a forfeiture of those rights. Neither the mother nor the majority has identified any basis in the law of forfeiture by procedural default or in the Adoption Act to contradict that conclusion.

¶199   The state's interests in assuring "stable and permanent homes for adoptive children in a prompt manner" and "preventing the disruption of adoptive placements" thus remain intact whether the parental rights at stake are those of a biological mother or a putative father. *See id.* UTAH CODE § 78B-6-102(5)(a). And it is in this sense that the question of perfection is irrelevant. It is not—as the majority suggests—a threshold question that can obviate the need to establish a historical basis for noncompliance with governing procedure. The historical inquiry is not aimed at finding a basis for whether the parent's right is fundamental or not. The historical inquiry is aimed at finding a basis for noncompliance with procedure despite holding fundamental parental rights. It bears repeating that no court has ever established a substantive due process right of a mother to retain her parental rights despite defaulting those rights under governing procedure. We certainly didn't establish such a right in *B.Y.* In fact, *B.Y.* left intact the standard put forth in *J.S.*—a standard that requires much more than a mere challenge to the "unfairness" of procedure for preserving parental rights, and that instead requires a deeply rooted historical basis for a fundamental right to retain parental rights despite failing to comply with the governing procedure. And, again, the mother has not come close to carrying that burden here, as discussed in more detail below.

¶200   *J.S.*, admittedly, is not a case involving a biological mother's forfeiture of parental rights through procedural default. So it is true that my proposed disposition would be an extension of *J.S.* insofar as that case did not involve a substantive due process

challenge to forfeiture of a mother's parental rights. But this only buttresses my point that this a case of first impression. And *J.S. is* our most relevant precedent, both bearing on forfeiture of parental rights through procedural default and suggesting a position in the levels of generality debate discussed above. *See supra* ¶¶ 179–88. The *J.S.* plurality advocated for a specific framing of the new right proposed to be established as a matter of substantive due process. And because the framing question is independent of whether a parent is a father or a mother, it bears directly on today's case and I would apply it.

¶201 The majority charges me with mischaracterizing the right at issue. It complains that I am "mark[ing] a fundamental departure from the way courts have traditionally defined parental rights." *Supra* ¶ 55. I am puzzled by this charge. I concede that there is a lot of novelty in this case. But the novelty comes from the majority's extension of the law of substantive due process—from its reframing of the alleged new right at the highest level of generality.

¶202 The cases I have cited admittedly deal only with the rights of putative fathers. But it does not at all follow that a mother's rights are insulated from procedural default. The mother, as noted, is not required to jump through procedural hoops to protect her rights at the outset. But the majority is seizing on a false procedural equivalence in insisting that that means she can never be subject to any procedure at any stage. The majority is accordingly right to highlight the novelty of this case. The novelty, however, is entirely in the majority opinion.

## C. Application of the Governing Standard

¶203 For the above reasons there is no basis in existing case law for the establishment of a substantive due process right for a mother to avoid the usual effect (forfeiture) of a procedural default. Certainly that does not follow from the premise that a mother's rights are unquestionably "fundamental." Much more analytical work is required under the above precedent. To sustain a right to preserve parental rights despite the failure to comply with established procedure, the mother should be required to make a showing at a specific level of generality based on firmly rooted history and tradition. *See In re Adoption of J.S.*, 2014 UT 51, ¶ 57 (plurality opinion). She should have to show not just the general notion of a fundamental right as a mother, but a right to preserve her rights without complying with established statutory procedure.

¶204 The mother has made no effort at such a showing. Instead she claims only (a) that mothers generally have rights that are automatically fundamental, and (b) that the procedure required by the Adoption Act is generally "unfair." The majority opinion's analysis is to the same effect. *See supra* ¶ 37 (asserting that "[a] right of a mother not to be deprived of parental rights without a showing of unfitness, abandonment, or substantial neglect is . . . fundamental" (citation and internal quotation marks omitted)).[219]

¶205 This falls far short under our law. And the mother's substantive due process claim should be rejected on the ground that she has failed to carry the heavy burden set forth in our cases—

---

[219] The majority also claims support for its view in the dictum in *New York v. Hill*, 528 U.S. 110, 116 (2000)—the notion that forfeiture "is not appropriate when it is inconsistent with the provision creating the right sought to be secured." *Supra* ¶ 98 n.174. In the majority's view this means that a decision allowing forfeiture "to defeat Mother's substantive due process claim in this case would be inconsistent with the Due Process Clause." *Supra* ¶ 98. But that is entirely circular. The court is asserting that the Due Process Clause prohibits forfeiture in this case because such forfeiture is inconsistent with the Due Process Clause.

That does not follow from *Hill*. That case, for one thing, deals with express waiver, not forfeiture by procedural default. And one of the two cases cited in support of the quoted statement is also an express waiver case. *See Hill*, 528 U.S. at 116 (citing *Smith v. United States*, 360 U.S. 1, 9 (1959)). The other case, emphasized by the majority, is admittedly a forfeiture case. *See supra* ¶ 98 n.174 (citing *Crosby v. United States*, 506 U.S. 255, 258–59 (1993)). *Crosby* held that a criminal defendant's right to be present at trial cannot be forfeited by failure to appear. 506 U.S. at 258–59. But the *Crosby* court based its holding on well-established case law finding that specific right to be unwaivable. 506 U.S. at 259. In other words, the right to exemption from the normal consequence of procedural default (forfeiture) was both narrowly framed *and* supported by history and tradition as shown by the long line of case law establishing that right. And that is surely not the case here—the majority cites not a single case establishing the right to avoid forfeiture in this context. The court's cited case law is accordingly unhelpful to it. *Hill* (and the cases it cites) are by no means a general license for a right to avoid forfeiture despite a procedural default, and on the contrary supports the approach I advocate for here.

a burden that the majority distorts in its decision today. Contrary to the majority's claim, I am not saying that the substantive due process right at issue is defined by "referencing the form of governmental interference." *Supra* ¶ 65. I am simply saying that the established procedures determine how and whether such a right is preserved.

¶206 It is tempting to see a technical defect in procedural compliance as a matter that should lightly be excused. But procedural rules are always two-edged. There is always an interest on the other side of the equation. And the procedural requirements of the Adoption Act are no exception.

¶207 The adoption arena is one where strict procedural compliance is at a premium. The state has a compelling interest in "providing stable and permanent homes for adoptive children in a prompt matter" and "preventing the disruption of adoptive placements." UTAH CODE § 78B-6-102(5)(a). To serve the interest of protecting "the welfare of the child, a determination that a child can be adopted must be final as well as immediate." *Wells v. Children's Aid Soc. of Utah*, 681 P.2d 199, 203 (Utah 1984). And statutory procedures for natural parents to participate in and assert their rights in adoption proceedings are a core element of this system.

¶208 We have long respected the interests advanced by the procedural requirements of the Adoption Act. We should continue do so here. The state's interests in stability and finality are no less substantial here—in a case involving a biological mother. And the majority has identified no legal basis for avoiding this conclusion.

## II

¶209 In setting the procedural rules for participation in an adoption proceeding, our legislature could have required that a biological mother be formally named as a party and served with a summons and petition for adoption. Some other states structure their law in this way.[220] And I can see an argument for favoring this

---

[220] *See, e.g.*, IOWA CODE § 232.112 (stating that the child's parents are "necessary parties to a termination of parent-child relationship proceeding and are entitled to receive notice and an opportunity to be heard"); MINN. STAT. § 260C.163(2) (parents of a child have "the right to participate in all proceedings on a petition" to terminate parental rights or a petition for an adoption); MO. REV. STAT. §§ 211.453 (requiring a petition for termination of parental rights be

(Continued)

sort of scheme. If I were a legislator I might be tempted to vote for this kind of adoption regime.

¶210    But I am not a legislator. And we are not being asked to take on the role of super-legislature. We are being asked to decide whether the constitution invalidates the adoption provisions that were enacted into law by the legislature that was elected into office by the people. The answer to that question is no. The majority breaks new constitutional ground in concluding otherwise. It cites no on-point precedent to support its novel adoption of a substantive due process right to override the effect that our law has long prescribed for a party's procedural default—forfeiture of the party's rights.

¶211 The majority's due process standard, moreover, threatens a wide range of adoption procedures in place in numerous states across the nation. Procedural default is a well-established basis for the termination of parental rights.[221] Yet the majority's standard calls this basis into question. When parental rights are terminated as a result of a mother's procedural default, the effect will always come about without proof of unfitness, abandonment, or neglect. And this effect, in the majority's view, will always trigger strict scrutiny. *Supra* ¶ 37. This sweeping extension of strict scrutiny threatens the viability of the procedures

---

served on the biological mother and informing the mother of her right to attend and participate in the dispositional hearing); 23 PA. CONS. STAT. § 2513 (requiring that notice be given to the parents before their rights are terminated and allowing them to freely participate in the hearing); S.C. CODE ANN. §§ 63-7-2550, -2560 (requiring a petition for termination of parental rights be served on the biological mother and guaranteeing the mother the right to legal counsel during the proceedings).

[221] *See, e.g.*, FLA. STAT. § 39.801(7) (permitting termination of parental rights based on a failure to appear at a scheduled hearing); OKLA. STAT. tit. 10A, § 1-4-905 (same); *see also, e.g.*, *C.R. v. Dep't of Children & Families*, 225 So.3d 393, 394-95 (Fla. Dist. Ct. App. 2017) (terminating a mother's parental rights following her failure to appear at trial); *In re H.L.L.*, 179 S.W.3d 894 (Mo. 2005) (en banc) (terminating a father's parental rights based on his failure to appear at a termination hearing); *In re Welfare of S.I.*, 337 P.3d 1114, 1115 (Wash. Ct. App. 2014) (terminating a mother's parental rights based on her failure to appear at a termination hearing).

and rules of procedural default or forfeiture. The majority seeks to mask this upheaval by emphasizing the "narrowness" of its holding, insisting that procedures regulating fundamental rights may yet be preserved—so long as they are "'narrowly tailored' to protect a 'compelling governmental interest.'" *Jones v. Jones*, 2015 UT 84, ¶ 27, 359 P.3d 603 (quoting *Washington v. Glucksberg*, 521 U.S. 702, 721 (1997)).

¶212   But this is no real brake on the majority's approach. The majority holds that a party's noncompliance with procedure is excused (on substantive due process grounds) so long as the *purpose* of a procedural requirement is fulfilled. *See supra* ¶¶ 47–48. The standard states, in other words, that a procedural requirement whose purpose can be fulfilled in an alternative manner is a procedural requirement that is not narrowly tailored.

¶213   And that is a principle with unlimited potential for mischief. The application of a strict scrutiny standard to procedural regulation of fundamental rights forecloses the whole idea of regulation by a uniform set of procedural rules. If the majority's approach takes root, our law will require case-by-case analysis of the viability of any and all procedural rules that may sustain the sanction of a default of a fundamental right. And this will undermine the whole point of procedural regulation. Our rules will be pointless if parties can ignore them and instead secure personalized standards set by the courts on a case-by-case basis.

¶214   The majority's framework calls into question a broad range of established procedures. The majority seeks to minimize the impact of its decision. *Supra* ¶ 37 n.67. But it has identified no meaningful limiting principle. Almost all procedure is *not* narrowly tailored. Most all procedural rules, by nature, are in a sense quite arbitrary. And that means that there will almost always be a less restrictive means of advancing the underlying goal.

¶215 Consider a standard procedural time bar, like a requirement that a party file an answer within thirty days, or a response to a motion for summary judgment within a prescribed timeframe. If a mother fails to file a timely answer or response to the motion her case may be defaulted. Does the principle of substantive due process give her the right to ignore the time limits in our rules because the time limits we have prescribed are arbitrary numbers and the underlying purpose is still served by a late filing? That is not how our law of procedure works. And the doctrine of substantive due process has never been employed in a

manner calling into question the enforceability of the procedural default rules built into our law of procedure.

¶216 Procedural default rules serve the state's compelling interests in promoting prompt and stable adoptions. *See supra* ¶ 42 (citing *Thurnwald v. A.E.*, 2007 UT 38, ¶¶ 30, 34, 163 P.3d 623). But such rules may often not be the least restrictive means of advancing those interests. When a rule of procedural default is not the least restrictive means of advancing the state's interests, the rule will be struck down as unconstitutional. And this will upset longstanding principles of procedural default and forfeiture—and undercut the reliance interests of adoptive parents and children. *See supra* ¶¶ 42, 82.

¶217 The majority opens the door to a new frontier of substantive due process scrutiny—scrutiny of the fairness of the procedures prescribed for the procedural default or forfeiture of legal rights. If the majority opinion is taken to its logical end, the law of procedural default or forfeiture will be forever pressed into a state of limbo. And parties in cases involving fundamental rights will stand in a particular state of unease.

¶218 Today we speak only to the rights of parents. But the logic of today's decision sweeps much more broadly. As framed by the court, it would cover any of a wide range of other fundamental rights—including the right to liberty (freedom from incarceration) or the right to vote. Our laws require those asserting their interest in freedom from incarceration to comply with procedural rules in the law of preservation. *See, e.g.*, UTAH CODE § 78B-9-106 (precluding relief under the Postconviction Remedies Act on any ground that "could have been but was not raised at trial or on appeal" or that "is barred by the limitation period established in Section 78B-9-107"); *see also, e.g.*, *Taylor v. State*, 2012 UT 5, 270 P.3d 471 (rejecting defendant's Postconviction Remedies Act claims because they were procedurally barred). The same goes for fundamental rights like the right to vote. *See, e.g.*, UTAH CODE § 20A-2-102.5 (establishing a voter registration deadline with limited exceptions). In the wake of today's decision the parties to a case involving these and other fundamental rights should be on notice that the usual effect of a procedural default (forfeiture) may not hold. The courts will retain the prerogative of second-guessing these procedures—and may set them aside if the majority's strict scrutiny standard is taken seriously.

¶219 This is troubling. The majority's novel approach threatens the very foundations of the law of procedural default or

forfeiture. And it places no meaningful limit on judicial discretion to second-guess the law in this field. Our precedent has charted a more principled course for recognizing viable substantive due process claims. I would apply that precedent here. And I would conclude that the mother has failed to carry her burden of proving a deeply rooted historical basis for a fundamental right to retain parental rights despite failing to comply with the governing procedure.

———————